Lisa A. ROBLES, Appellant–Petitioner,

v.

Rudy ROBLES, Sr., Appellee–Respondent.

No. 48A02–0511–CV–1071.

Court of Appeals of Indiana.

Nov. 1, 2006.

Jane G. Cotton, Anderson, IN, Attorney for Appellant.

Mark R. Regnier, Bingham, Farrer & Wilson, P.C. Elwood, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellant-petitioner Lisa A. Robles appeals the trial court's order determining that her minor child was emancipated for purposes of child support payments by her former husband, appellee-respondent Rudy Robles, Sr. Lisa also challenges the trial court's modification of the support decree with respect to calculation of the parties' incomes, the proper amount of credit to which Rudy was entitled regarding the overnight visits that he had with the children, and the amount of credit that Rudy was due for the payment of weekly health insurance premiums. Concluding that the trial court properly determined that the parties' child was emancipated and finding no other error, we affirm the judgment of the trial court.

## FACTS

Lisa and Rudy were married on October 21, 1988. Four children were born to the marriage, and on November 19, 2001, Lisa petitioned to dissolve the marriage. The property settlement agreement, which was incorporated into the dissolution decree on November 19, 2001, awarded custody of all four children to Lisa, and Rudy was ordered to pay support in the amount of $250 per week. There was no provision obligating Rudy to pay the post-secondary expenses of the children.

On April 22, 2003, Rudy and Lisa entered into an agreement providing that

Rudy was in arrears in his support obligation in the amount of $2,387.90. As a result, Rudy's support obligation was increased to $275 per week, and he was ordered to pay $20 per week on the arrearage.

In March 2003, Rudy was charged with the battery of the parties' seventeen-year-old daughter, Victoria. Rudy subsequently pleaded guilty to this offense. Thereafter, on September 8, 2004, Lisa filed a petition to modify support and visitation. In response, Rudy filed a petition for the trial court to declare Victoria, who was born on March 31, 1986, emancipated as of her eighteenth birthday, and to modify his support obligation accordingly. Rudy also filed a citation for contempt, alleging that Lisa had failed to pay a number of medical bills that she had been ordered to pay.

On June 1, 2005, the trial court conducted a hearing with regard to all pending petitions and motions. At the time of the hearing, Victoria was nineteen years old. In late 2003 or early 2004, Victoria became pregnant, and the child was less than one year old at the time of the hearing. Victoria testified that she was unemployed and planned to continue attending Ivy Tech's Practical Nursing program. Victoria also stated that she moved out of Lisa's home and has lived with the baby's paternal grandparents since June 2004. While living there, Victoria made no rent, utility, or telephone payments. In essence, Victoria only paid for "personal things," such as clothing, prescriptions, and entertainment. Tr. p. 78. The baby's father provides diapers, clothes, baby food, and some other financial needs for the child. However, he moved out of the residence in January 2005 after he and Victoria ended their relationship. The evidence revealed that Victoria began attending Ivy Tech Community College (Ivy Tech) on a full time basis during the 2004–2005 school year.

The evidence also showed that Rudy earned $25.02 per hour at a construction firm. He acknowledged that he typically did not work a forty-hour week because "it depends on the weather sometimes." Id. at 25. Rudy also testified that he would be getting a raise and would learn about his new pay rate sometime "this week." Tr. p. 28. However, when the trial court heard further evidence on June 30, Rudy did not submit additional pay stubs, and he did not testify as to the amount of his anticipated pay increase. Thus, it was established that Rudy's yearly income as of June 11, 2005, was $19,901.37, which revealed average earnings of $865.28 per week. Id. at 55.

Additionally, while Rudy's Child Support Obligation Worksheet indicated that he paid a weekly health premium for the children in the amount of $20.00, he testified at the hearing that his cost was $4.80 per week. The parties also stipulated at the June 30 hearing that Lisa would supervise the children during Rudy's extended visits while he worked and that Rudy would not claim a daycare credit for those periods. Rudy further claimed that his children spent 167 nights with him from December 2003 until December 2004, and acknowledged that he had not seen Victoria for nearly two years. While Lisa did not cross-examine Rudy about these visits, Lisa's counsel argued that Rudy should receive credit for only 134 overnight visits because the calendar that he submitted at the hearing was misleading. Specifically, Lisa's counsel pointed out that the calendar included thirteen months and that several of the nights that Rudy counted were actually not overnight visits.

Lisa testified that she was employed by Airmark Sports and Entertainment as a concession stand manager. When she worked at Victory Field in Indianapolis, she earned $9.50 per hour. At Verizon

Wireless Music Center, she made $7.00 per hour. As Lisa did not work a forty-hour week, it was determined that her pay was at the hourly minimum wage.

Following the hearing, the trial court issued the following order:

1. Parties' child, Victoria, is emancipated as of September 22, 2004.

2. Respondent child support obligation is modified to the amount of $167.00 per week, retroactive to September 22, 2004. 6% rule equals $1,117.00, uninsured healthcare expenses are allocated 77% to Respondent, 23% to Petitioner.

3. Respondent shall be allowed credit to his child support obligation for any overages paid on child support since September 22, 2004 to present date.

4. Petitioner is ordered, within 45 days of this date, to make satisfactory arrangements for payment of her 6 percent rule obligation or co-payment obligation for the medical expenses listed on Respondent's Exhibit E.

5. Respondent shall be allowed to care for Parties' minor children on evenings when Petitioner works as part of Respondent parenting time.

Appellant's App. p. 42. Lisa now appeals.

### DISCUSSION AND DECISION

#### I. Emancipation

Lisa first argues that the trial court erred in determining that Victoria was emancipated. Specifically, Lisa argues that the evidence failed to establish that Victoria was "self-supporting" for purposes of emancipation. Appellant's Br. p. 10.

In resolving this issue, we initially observe that what amounts to emancipation of a child is a question of law, but whether there has been an emancipation is a question of fact. *Ratliff v. Ratliff,* 804 N.E.2d 237, 246 (Ind.Ct.App.2004). The issue of emancipation is governed by Indiana Code section 31–16–6–6, which provides in pertinent part that:

The duty to support a child under this chapter ceases when the child becomes twenty-one (21) years of age unless any of the following conditions occurs:

(1) The child is emancipated before becoming twenty-one (21) years of age. In this case the child support, except for the educational needs outlined in section 2(a)(1) of this chapter, terminates at the time of emancipation, although an order for educational needs may continue in effect until further order of the court.

(2) The child is incapacitated. In this case the child support continues during the incapacity or until further order of the court.

(3) The child:

(A) is at least eighteen (18) years of age;

(B) has not attended a secondary or postsecondary school for the prior four (4) months and is not enrolled in a secondary or postsecondary school; and

(C) is or is capable of supporting himself or herself through employment.

In this case the child support terminates upon the court's finding that the conditions prescribed in this subdivision exist. However, if the court finds that the conditions set forth in clauses (A) through (C) are met but that the child is only partially supporting or is capable of only partially supporting himself or herself, the court may order that support be modified instead of terminated.

(b) For purposes of determining if a child is emancipated under subsec-

tion (a)(1), if the court finds that the child:

(1) has joined the United States armed services;

(2) has married; or

(3) is not under the care or control of:

  (A) either parent; or

(B) an individual or agency approved by the court;

the court shall find the child emancipated and terminate the child support.

In this case, there is no dispute that Victoria was not disabled, not married, and not in the armed forces. Thus, the only basis for Victoria's emancipation is under subsection (b)(3) of the statute, i.e., that she "is not under the care or control of either parent or an individual agency approved by the court."

We note that our statute does not address cohabitation. While our courts have not had the occasion to specifically address the emancipation issue where an eighteen-year-old gives birth to a child, chooses to leave her parent's home, and begins living with the father of her newborn child, Lisa directs us to our Supreme Court's opinion in *Dunson v. Dunson,* 769 N.E.2d 1120, 1123 (Ind.2002), in support of her position that Victoria could not be declared emancipated:

> [W]e reaffirm the longstanding view that emancipation requires that (1) the child initiate the action putting itself outside the parents' control and (2) the child in fact be self-supporting.

> Indiana Code section 31–16–1–2 states that "[t]he purpose and policy of [31–16–6 is] to provide for child support." We believe the legislature's intent in enacting the emancipation statute is to require that parents provide protection and support for the welfare of their children until the children reach the specified age or no longer require such care

and support. Reading subsection (b)(3) in isolation to permit emancipation of children who are no longer under parents' care or control conflicts with this underlying purpose. *If this "automatic emancipation" is permitted, parents are permitted to "divorce their children" and avoid paying child support simply by sending their children to live with a third party or, worse yet, just throwing the child out of the house.*

In 1984, the legislature enacted what is now subsection (b), which provides that a child who joins the United States armed services, gets married, or is not under the care and control of either parent is emancipated. I.C. § 31–16–6–6. This language evolves from prior case law. *Green v. Green,* 447 N.E.2d 605 (Ind.Ct.App.1983), *trans. denied,* involving the emancipation of a married daughter, was decided a year before the enactment of subsection (b). The court identified several situations in which a minor child may place itself beyond the control and support of its parent, including entering the military and "voluntarily leaving the home of a parent and assuming responsibility for its own care." *Id.* at 609. *Green* stated, "The salient feature of these situations is the child creates a new relationship between itself and its parent, relieving the parent from the responsibilities of support." *Id.* Green concluded that marriage of a minor child creates a similar relationship, and also emancipates the child. *Id.* at 610. We think the legislature intended to adhere to *Green* by enacting subsection (b), and did not intend to permit emancipation without the child's active participation. Thus *we think the statutory phrase "not under the care and control" carries with it the implication that the child must be the one who "creates a new relationship" or "voluntarily leaves home." Certainly, the oth-*

*er two circumstances—marriage and service in the armed forces—apply only if the child takes affirmative action.*

The language of subsection (b)(3), viewed in isolation, leads to the conclusion that neither self-support nor initiative of the child is required for emancipation. Here, however, we think both stare decisis and legislative acquiescence support the view that subsection (b)(3) requires that the child must in fact be supporting itself to be emancipated. The idea that children must be supporting themselves to be emancipated has been a part of Indiana case law since at least 1952. *Corbridge v. Corbridge,* 230 Ind. 201, 208, 102 N.E.2d 764, 767 (1952) (child deemed emancipated because he was in military and could support himself, but "if the child becomes unable to support itself, the father's duty [to support the child] revives").

The view that emancipation requires that "the child place herself" beyond the parents' control has been frequently assumed or restated since subsection (b)(3) was enacted. Subsequent case law has also maintained the self-supporting component of emancipation in interpreting the emancipation statute. *See e.g., Young v. Young,* 654 N.E.2d 880, 883 (Ind.Ct.App.1995), *trans. denied* ("Our inquiry under [subsection (b)(3)] is whether the child is in fact supporting herself without the assistance of her parents."); *Taylor v. Chaffin,* 558 N.E.2d 879, 883 (Ind.Ct.App.1990) ("Our inquiry under [subsection (b)(3)] is not whether the child is capable of supporting herself but whether the child is in fact supporting herself without the assistance of her parents."). Indeed, in *Quillen,* 671 N.E.2d at 100, this Court adopted and incorporated by reference a Court of Appeals opinion interpreting subsection (b) to that effect. The court there stated, "To determine whether a child has placed herself beyond the control, custody and care of either parent, we consider whether the child is in fact supporting herself without the assistance of her parents." *Quillen,* 659 N.E.2d at 576. Elimination of self-support and the child's initiative as components of emancipation would be a radical departure from precedent. It would seem to permit parents to liberate themselves from support obligations by unilateral action. In view of the frequently recited judicial assumption that the statute retained these, we do not think the 1984 amendment effected such a drastic change by omission.

(Emphases supplied).

In addition to the above, *Butrum v. Roman,* 803 N.E.2d 1139, 1146 (Ind.Ct. App.2004), seemingly reiterated the *Dunson* rationale with respect to the interpretation of subsection (b)(3) of our emancipation statute. In accordance with *Butrum:*

In order to prove that a child is not under the care or control of either parent, our supreme court has found that the child must (1) initiate the action putting himself or herself outside the parents' control and (2) in fact be self-supporting. *Dunson,* 769 N.E.2d 1120. Undisputedly, H.R. initiated the action putting herself outside her parents' control when she moved in with her boyfriend. But, in order for emancipation, H.R. also must be self-supporting. We observe that this self-supporting requirement is similar to (a)(3)'s requirement that the child "is or is capable of supporting himself or herself through employment." I.C. § 31–16–6–6(a)(3)(C). However, there is one notable difference. Subsection (b)(3) requires the child to be self-supporting, while subsection (a)(3) requires the child to be self-supporting or capable of supporting himself or herself. Thus, a par-

ty faces a higher burden under subsection (a)(3).

■ In considering the above, we acknowledge that a woman's act of becoming pregnant and giving birth to a child out of wedlock is not an exception listed in Indiana Code section 31–16–6–6(b). However, the evidence shows that even though Victoria had not yet turned twenty-one, she removed herself from her parents' control and was supporting herself. Victoria did so by placing herself with her boyfriend's parents who supplied her and the child with free room and board and daycare. Moreover, Victoria was receiving money from the baby's father to help her living situation. While there is no evidence indicating that Victoria was fully self-supportive, it may certainly be inferred that any support given to Victoria will naturally aid her young child.

Finally, we note that the evidence presented in this case does not support the notion that Rudy is merely attempting to "divorce his child" in an effort to avoid his child support obligation. *See Dunson,* 769 N.E.2d at 1123. And Rudy certainly did not "send" Victoria to live with another. *See id.* Thus, when considering the circumstances here, we conclude that the trial court properly found that Victoria was emancipated.

*II. Modification of Child Support*

In a related issue, Lisa maintains that the trial court abused its discretion in modifying Rudy's child support obligation on additional grounds. Specifically, Lisa argues that the trial court: (1) improperly calculated the parties' income because the evidence showed that Rudy changed employers in order to reduce his child support obligation; (2) granted Rudy childcare credit for several overnight visits with the children that were not supported by the evidence; and (3) granted Rudy credit for health insurance obligations that were not supported by the evidence.

■ We initially observe that decisions regarding the modification of child support are reviewed for an abuse of discretion. *Harris v. Harris,* 800 N.E.2d 930, 937 (Ind.Ct.App.2003). Such decisions should be reversed if they are deemed clearly erroneous. *Id.* Also, on appeal from a trial court's order modifying child support, we do not weigh the evidence or judge the credibility of the witnesses but, rather, consider only that evidence most favorable to the judgment, together with the reasonable inferences that can be drawn therefrom. *Scoleri v. Scoleri,* 766 N.E.2d 1211, 1215 (Ind.Ct. App.2002). The petitioner seeking modification of child support bears the burden of proving a substantial change in circumstances justifying modification. *Id.*

In accordance with Indiana Code section 31–16–8–1:

Child support awards may be modified only:

(1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or

(2) upon a showing that:

(A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and

(2) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

■ With respect to the trial court's calculation of the parties' income, both Lisa and Rudy acknowledged that their incomes had changed. Tr. p. 25–27, 63. Rudy asserted that his weekly gross income for purposes of determining child support was $865. Tr. p. 58. He also

testified that the amount of insurance premium deducted from his paycheck that was attributable to the children was $4.80 per week. *Id.* at 56. Following a discussion with the parties' counsel, the trial court determined that Lisa's weekly gross income was $210, and Rudy's was $865. *Id.* at 70–71, 58. The trial court then used the year-to-date figures in calculating Rudy's gross income, and only attributed minimum wage to Lisa because her year to date income appeared to be somewhat less than the amount of her typical hourly wages. *Id.* While Lisa complained that Rudy left a higher paying job for voluntary reasons and that his current weekly gross income should have been based on wages from his prior employment, Rudy was never cross-examined as to why he left his former employment to begin working for a different construction company. Hence, Lisa has failed to make any showing that Rudy left his previous employment for the purposes of becoming underemployed in order to reduce his child support payments. Thus, Lisa's claim that the trial court improperly calculated the parties' incomes fails.

■ With regard to the overnight visitations, we note that Rudy offered his calendar documenting his 167 visits into evidence at the hearing without any objection from Lisa. Tr. p. 11. While Lisa contested the number of overnights by offering a different number—134—in her calculations, her counsel simply remarked that Rudy's figures were incorrect. *Id.* at 115–16. Later in the hearing, Rudy conceded that his calendar of overnight visits included the month of December 2003, when the visits should not have been counted until January 2004. Even so, 149 entries remained even when excluding the number of visits that had occurred in December. That said, it is apparent that the trial court heard the evidence, judged the credibility of the witnesses, and determined that Rudy's number of overnights was closer than Lisa's version. Because the number of overnight visits that the trial court determined for which Rudy should receive credit was within the scope of the evidence presented at the hearing, we decline to disturb the trial court's judgment on this issue.

Finally, with regard to the credits for the weekly health insurance premiums, Rudy's child support obligation worksheet indicates that he paid a weekly health premium for the children in the amount of $20.00. Appellant's App. p. 47. However, Rudy testified at the hearing that he paid only $4.80 per week in insurance premiums attributable to the children. Tr. p. 56. Given these circumstances, and because Lisa has failed to show that the trial court used the figures set forth in the child support obligation worksheet—rather than Rudy's testimony—when calculating the amount of modified amount of child support, we will not assume as much. Thus, Lisa has failed to show any error with respect to this issue.

### CONCLUSION

In light of the issues discussed above, we conclude that the trial court properly determined that Victoria was emancipated. We also find that the trial court did not err in calculating the parties' incomes, that the trial court's determination as to the number of the children's overnight visitations with Rudy was not error, and that Lisa has failed to prove that the trial court erred in determining the amount of credit that Rudy was due for the payment of the children's healthcare insurance premiums.

The judgment of the trial court is affirmed.

VAIDIK, J., and CRONE, J., concur.