Michael CARPENTER, Appellant–
Petitioner,

v.

Shawna CARPENTER, Appellee–
Respondent.

No. 48A04–0801–CV–1.

Court of Appeals of Indiana.

July 31, 2008.

Richard Ranucci, Indianapolis, IN, Attorney for Appellant.

Christopher A. Cage, Anderson, IN, Attorney for Appellee.

## OPINION

ROBB, Judge.

### Case Summary and Issues

Michael Carpenter ("Father") appeals from the trial court's order on his petitions for modification of child custody and child support; and for emancipation of child and for child support.[1] Father raises four issues, which we restate as: 1) whether the trial court's finding that Father's son, B.C., was only partially capable of supporting himself was clearly erroneous; 2) whether the trial court improperly declined to order that Father be reimbursed for overpayment of a child support arrearage; 3) whether the trial court improperly modified the initial decree by allowing his former wife to claim two tax exemptions previously used by him; and 4) whether the trial court improperly determined the amount of weekly child support owed by Father. Concluding the evidence does not support the trial court's finding that B.C. is only partially capable of supporting himself, we reverse and remand. We also conclude that the trial court's findings do not support the re-assignment of the tax exemptions, and instruct the trial court to reconsider its determination after addressing the factors set out in the Child Support Guidelines. Finally, we direct the trial court to make findings of fact regarding Father's overpayment, and to issue new findings regarding this issue. Because we are remanding for a new order, we need not address the fourth issue.

### Facts and Procedural History

Father and Shawna Carpenter ("Mother") were married in 1987 and had four children. On January 6, 2004, the trial court entered a decree of dissolution and approved the parties' settlement agreement. Under this agreement, Mother was to have custody of the children, and Father was to pay child support in the amount of $345 per week plus an additional $25 per week towards a $6,000 arrearage. Pursuant to the agreement and the trial court's order, these payments were made through wage assignment. The agreement indicated that Mother would assign the four tax exemptions for the children to Father.

On May 13, 2004, the Madison County Prosecuting Attorney intervened to collect child support, and notified the Secretary of the Treasury of Father's child support arrearage so that Father's federal tax refunds could be withheld to pay the arrearage. On February 9, 2006, the trial court issued an order indicating that Father's arrearage had been paid in full. Father then took action to reduce the amount withheld from his wages so that he was no longer paying the $25 per week. As discussed in more detail below, due to either the tax intercept or Father's wage withholdings, Father ultimately overpaid his arrearage by $2,693.

On April 18, 2007, Father filed a Verified Motion for Modification of Child Custody and Child Support, and a Verified Motion for Emancipation of Child and for Modification of Child Support. Although Father has failed to include copies of these motions in his appendix, it is apparent that Father requested that the trial court grant him custody of one child, who had moved out of Mother's residence and in with Father; terminate his child support obligation with regard to B.C., his oldest son; and credit Father for the overpayment on his arrearage. At the hearing on Father's motions, Mother requested that the trial

1. Father has failed to include these petitions in his appendix. We direct counsel to Indiana Appellate Rule 49(A)(2)(f), which indicates the pleadings should be included in the appellant's appendix.

court allow her to retain two of the tax exemptions.

On November 13, 2007, the trial court entered an order along with findings and conclusions. In this order, the trial court concluded that B.C. was partially emancipated, declined to give Father credit for overpayment of his arrearage, ordered Mother to sign a waiver of one tax exemption and allowed her to retain two tax exemptions,[2] and reduced Father's weekly child support obligation to $269.76. Father now appeals.

### Discussion and Decision

### I. Standard of Review

Indiana places a "strong emphasis on trial court discretion in determining child support obligations." *Brown v. Brown*, 849 N.E.2d 610, 613 (Ind.2006) (quoting *Stultz v. Stultz*, 659 N.E.2d 125, 128 (Ind.1995)). We will not reverse a trial court's decision regarding the modification of a child support order unless it is clearly erroneous. *Id.* On appeal, we do not reweigh evidence or judge witness credibility. *See Butrum v. Roman*, 803 N.E.2d 1139, 1146 (Ind.Ct.App.2004), *reh'g denied*, 806 N.E.2d 66 (Ind.Ct.App.2004), *trans. denied*. We will consider only the evidence and reasonable inferences from that evidence favorable to the judgment. *Bales v. Bales*, 801 N.E.2d 196, 198 (Ind. Ct.App.2004), *trans. denied*.

We also note that in this case, the trial court entered findings and conclusions at a party's request. Accordingly, "we are not at liberty simply to determine whether the facts and circumstances contained in the record support the judgment." *McGinley–Ellis v. Ellis*, 638 N.E.2d 1249, 1252 (Ind.1994). Instead, our standard of review is two-tiered: we will determine whether evidence supports the findings and then whether the findings support the judgment. *Dedek v. Dedek*, 851 N.E.2d 1048, 1050 (Ind.Ct.App.2006). We "shall not set aside the findings or judgment unless clearly erroneous." Ind. Trial Rule 52(A); *see Dunson v. Dunson*, 769 N.E.2d 1120, 1123 (Ind.2002). We will conclude a finding is clearly erroneous "when a review of the record leaves us firmly convinced that a mistake has been made." *Dedek*, 851 N.E.2d at 1050. We will conclude the trial court's "judgment is 'clearly erroneous only if (i) its findings of fact do not support its conclusions of law or (ii) its conclusions of law do not support its judgment.'" *Dunson*, 769 N.E.2d at 1123 (quoting *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996)). Although we defer to a trial court's ability to find the facts, "we do not defer to conclusions of law, and a judgment is clearly erroneous if it relies on an incorrect legal standard." *Dedek*, 851 N.E.2d at 1050.

We note that in this case, the trial court adopted, verbatim, Mother's findings and conclusions.[3] Although wholesale adoption is not prohibited, we do not encourage trial courts to engage in this practice. *See In re Marriage of Nickels*, 834 N.E.2d 1091, 1096 (Ind.Ct.App.2005). We have recognized that "this practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court." *Safety Nat'l Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 993 n. 6 (Ind.Ct.App.2005), *trans. denied.* Our confidence is particularly eroded in cases such as this, where the resolution depends "less on the credi-

---

2. It appears that the trial court and the parties assume that B.C. will claim himself, thereby precluding Mother or Father from claiming him as a dependent.

3. Indeed, the trial court's order is captioned "Respondent's Findings of Fact and Conclusions of Law."

bility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony." *Village Commons, LLC v. Marion County Prosecutor's Office*, 882 N.E.2d 210, 218 (Ind.Ct.App.2008) (quoting *Prowell v. State*, 741 N.E.2d 704, 708–09 (Ind. 2001)). Although we do not apply an altered standard of review when a trial court adopts a party's findings verbatim, "near verbatim reproductions may appropriately justify cautious appellate scrutiny." *Stevens v. State*, 770 N.E.2d 739, 762 (Ind. 2002), *cert. denied*, 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 56 (2003).

## II. Termination of Support Obligation

■■■ Indiana parents have a common law duty to support their children. *Bales*, 801 N.E.2d at 198. The obligation to pay child support usually continues until the child's twenty-first birthday. *Lea v. Lea*, 691 N.E.2d 1214, 1215 (Ind.1998). However, under Indiana Code section 31–16–6–6:

> (a) The duty to support a child under this chapter ceases when the child becomes twenty-one (21) years of age unless any of the following conditions occurs:
>
> * * *
>
> (3) The child:
>
> (A) is at least eighteen (18) years of age;
>
> (B) has not attended a secondary or postsecondary educational institution for the prior four (4) months and is not in enrolled in a secondary or postsecondary educational institution; and
>
> (C) is or is capable of supporting himself or herself through employment. In this case the child support terminates upon the court's finding that the condi-

tions prescribed in this subdivision exist. However, if the court finds that the conditions set forth in clauses (A) through (C) are met but that the child is only partially supporting or is capable of only partially supporting himself or herself, the court may order that support be modified instead of terminated.

Here, it is undisputed that subsections (A) and (B) are satisfied. The only issue is whether the evidence supports the trial court's finding that "[B.C.] is not able to fully support himself without the aid of his parents and has no present ability to bear the full brunt of all the obligations which come with full emancipation." Appellant's App. at 11 (trial court finding of fact 14).

■■■ We first pause to clarify the apparent misconception held by Mother and the trial court. Subsection (a)(3) does not deal with the "emancipation" of a child; it merely identifies circumstances under which our legislature has determined a parent's obligation to pay child support should terminate. Whether a child is "emancipated" is an entirely separate inquiry. *See Borders v. Noel*, 800 N.E.2d 586, 591 (Ind.Ct.App.2003) (recognizing that subsection (a)(3) is an "alternative basis" to emancipation for terminating child support); *Marshall v. Marshall*, 601 N.E.2d 9, 12 n. 2 (Ind.Ct.App.1992) (recognizing that what is now subsection (a)(3)[4] "does not define emancipation"); *Brancheau v. Weddle*, 555 N.E.2d 1315, 1317 n. 1 (Ind.Ct.App.1990) (recognizing that because the father argues his support obligation should cease under what is now section (a)(3), "we have no occasion to consider whether [the child] was 'emancipated' as the term is used in [what is now section (a)(1) ]"). That is, if the conditions of subsection (a)(3) are met, child support must

---

4. *Marshall* was decided under Indiana Code section 31–1–11.5–12(d)(3), which is substantially identical to current Indiana Code sec- tion 31–16–6–6(a)(3), *see Dennison v. Dennison*, 696 N.E.2d 88, 90 n. 2 (Ind.Ct.App. 1998).

be terminated even if the child is not emancipated. *See Marshall,* 601 N.E.2d at 12 n. 2 (recognizing that a finding that the conditions of what is now subsection (a)(3) are met "terminates the parental obligation of support as a matter of law whether or not the court enters a finding of emancipation"). The trial court's findings and its comments at the hearing leave us with a substantial concern that it did not recognize that whether B.C. was emancipated was not determinative of whether support should cease under subsection (a)(3). *See* Appellant's App. at 14 (trial court finding that B.C. "has no present ability to bear the full brunt of all obligations which come with full emancipation"); Tr. at 14 (trial court stating that B.C. "still lives at home, he's not in school, he graduated from high school and he's got a ten dollar an hour job ... I don't think that makes him emancipated"); *id.* at 14 (trial court stating: "I lived at home til I was twenty-six (26) and ... I don't know when I became emancipated."); *id.* ("[I]f he moves out and keeps his own place, I think he clearly is emancipated."); *id.* at 42 ("Well, I based on what I heard before, he's not emancipated. He had the job, he was working, he was making some money. I don't think the evidence shows he was emancipated at all."). Mother, in her appellate brief, also makes various arguments relating to why B.C. is not or should not be "emancipated." We emphasize that whether B.C. is or should be "emancipated" is not at issue here. We need not decide whether our fear that the trial court misapplied the law renders remand or reversal necessary, however, as we conclude that the trial court's finding that B.C. was not capable of supporting himself is not supported by the evidence.

B.C. testified that he was currently working with an electrician company making $10.50 per hour. He testified that he normally worked forty hours per week, and sometimes more. When explaining why he still lived with Mother, he stated:

> Ah, basically, I've gotten myself in a bind to where I've ah, I guess the debt ratio, they call it debt ratio, my debt is so high that the money coming in is, after I pay my bills, basically, I've not enough to move out. Cause I was gonna move in with my friend an he was only gonna charge me three hundred ($300.00) a month, but then once I figured out the luxuries and not having my mom around, you know, not making my lunch, not buying the lunch meat, [i]t'd be, ten bucks ($10.00) extra a month to spend on gas.
>
> * * *
>
> I'd much rather buy all the stuff I want now material wise and then once it's all paid off in a couple of years, move into a house. I'd rather live in a nice house with nice stuff rather than, you know, only have a nice house. If I live with my mom now, I can, don't have any bills. I can buy all my little toys, get them paid off and then when I do decide to move out, I'll have all those with me.

Tr. at 53–54. With regard to his expenses, B.C. identified a satellite bill, cell phone bill, a $1,500 debt with Best Buy for a flat-screen television, his car payment, and insurance for his car and his motorcycle. He also stated that he paid his grandparents periodically for the motorcycle, which they had bought for him as "basically a graduation gift." *Id.* at 55. He stated that "the reason I can't support myself is because, basically, too many small bills adding up and not enough coming in." *Id.* at 57.

We recognize that B.C. stated at the hearing that he was considering leaving his employment with the electrician company. However, he also indicated that he wished to stay there until he found another job,

that he has told a prospective employer that he would not take a job unless he received the same pay as at his present job, but that he "would almost take a fifty cent, you know pay cut to do what I love." *Id.* at 64.

We also note another apparent misconception held by the trial court and Mother. Both the trial court's findings and Mother's appellate brief seem to imply that because B.C. lives at home and receives substantial financial benefit from this arrangement, Father's support obligation should continue.[5] However, subsection (a)(3) makes crystal clear that a child need not be actually supporting himself, but must merely be *capable* of supporting himself. *See Robles v. Robles,* 855 N.E.2d 1049, 1054 (Ind.Ct.App.2006) ("Subsection (b)(3) requires the child to be self-supporting, while subsection (a)(3) requires the child to be self-supporting or capable of supporting himself or herself." (quoting *Butrum,* 803 N.E.2d at 1146)); *Willard v. Peak,* 834 N.E.2d 220, 223 (Ind.Ct.App. 2005) ("[U]nder exception (3) . . . we must examine the issue both subjectively—whether she is supporting herself—and objectively—whether she is capable of supporting herself."). The trial court's findings and its statements at the hearing leave us in doubt that the trial court understood this distinction. Before the hearing, the trial court commented that "if he's given up that job, then your case [for ceasing child support] is, is gone." Tr. at 42. Voluntarily giving up a job would impact whether B.C. was actually support-

ing himself, but would not effect whether he was *capable* of supporting himself.

Although B.C. does have bills, they result from his purchase and maintenance of luxury items. These expenses are not the type we have previously found to support a conclusion that a child is incapable of supporting himself. *See Brancheau,* 555 N.E.2d at 1318 (finding that the evidence "establishes that [child] and her mother, with their incomes pooled, are unable to afford basic necessities such as dental care for [child]"). Indeed, the luxury items—a motorcycle in addition to a car, a television costing at least $1,500—are not fairly considered items that one must purchase in order to support himself or herself. B.C. has no dependents, was working fulltime making over $21,000 a year, and has no extraordinary expenses related to the necessities of life. Under these circumstances, the trial court's finding that B.C. was not fully capable of supporting himself is clearly erroneous.[6] *Cf. Borders,* 800 N.E.2d at 591 (concluding that evidence that the child was working full-time earning $8.55 per hour supported a conclusion that the child was capable of supporting himself).

We therefore reverse the trial court's order and remand with instructions that the court terminate Father's child support obligation with regard to B.C. and recalculate the amount of support. *See In re Paternity of H.M.H. by Massey v. Hull,* 691 N.E.2d 1308, 1310 (Ind.Ct.App.1998) (reversing the trial court's decision to order an execution of a waiver of an exemp-

---

**5.** This misconception may be merely an extension of the misconception regarding the distinction between emancipation and discontinuing a support obligation under subsection (a)(3). *Cf. Dunson v. Dunson,* 769 N.E.2d 1120, 1124–25 (Ind.2002) (recognizing that for a child to be emancipated, the child must be outside the parents' control and actually be self-supporting).

**6.** We note that the poverty level for a single individual with no dependents in 2007 was $10,787. *See* U.S. Census Bureau Poverty Thresholds 2007, available at http://www. census.gov/hhes/www/poverty/threshld/thresh 07.html (last visited July 11, 2008).

tion, and noting "that in doing so, the trial court may be required to recalculate support because one change such as this may produce a change in the entire economic situation of the parties").

### III. Assignment of Tax Exemptions

In its conclusions, the trial court ordered that "the tax exemptions shall be modified so as to provide that [Father] claim [Co.C.] each year and [Mother] shall be permitted to claim [R.C.] and [C.C.] each year." Appellant's App. at 12. Our reversal of the trial court's decision that B.C. is only partially capable of supporting himself inherently requires the trial court to reconsider the allocation of the tax exemptions, *see* *Hull,* 691 N.E.2d at 1310; *DeBoer v. De-Boer,* 669 N.E.2d 415, 425 (Ind.Ct.App. 1996) ("With the reversal of the order concerning alimony, the trial court must redetermine the tax exemption claim."), *trans. denied.* However, to guide the trial court in making this determination, we will discuss the applicable law regarding the allocation of these exemptions.

■■■■ Federal law grants a dependency exemption to the custodial parent, but allows that parent to execute a written waiver of that exemption. *See* 26 U.S.C. § 152(e). Indiana courts have held that "[i]n a proper case, the trial court may order the custodial parent to sign a waiver of the presumed right to claim the child as a dependent for federal income tax purposes." *Skinner v. Skinner,* 644 N.E.2d 141, 149 (Ind.Ct.App.1994). When determining whether to order such a waiver, the Child Support Guidelines recommend that a trial court consider the following factors:

(1) the value of the exemption at the marginal tax rate of each parent;

(2) the income of each parent;

(3) the age of the child(ren) and how long the exemption will be available;

(4) the percentage of the cost of supporting the child(ren) borne by each parent;

(5) the financial burden assumed by each parent under the property settlement in the case.

Ind. Child Support Guideline 6, Comment. "Taking into account those factors, a 'trial court's equitable discretion should be guided primarily by the goal of making the maximum amount of child support available for the child.'" *Sims v. Sims,* 770 N.E.2d 860, 867 (Ind.Ct.App.2002) (quoting *Lamon v. Lamon,* 611 N.E.2d 154, 159 (Ind.Ct.App.1993)). "The noncustodial parent bears the burden of demonstrating the tax consequences of transferring the exemption and how such a transfer would benefit the child." *Harris v. Harris,* 800 N.E.2d 930, 941 (Ind.Ct.App.2003), *trans. denied.*

■■■■ Although the Guidelines are worded in permissive terms ("it is recommended that at a minimum the following factors be considered"), our decisions make clear that a trial court should consider these factors if a party raises the issue of tax exemptions and that this court will assess these factors when determining whether the trial court abused its discretion. *See Quinn v. Threlkel,* 858 N.E.2d 665, 675 (Ind.Ct.App.2006) (indicating that "there are at least five factors for trial courts to consider when deciding whether to order a release of an exemption," and "considering all of these circumstances" in analyzing whether the trial court abused its discretion); *Hull,* 691 N.E.2d at 1309 (indicating that in *Lamon,* "we set forth factors *to be considered* in determining whether to order the custodial parent to sign a waiver of her right to the income tax dependency exemption" (emphasis added)); *Skinner,* 644 N.E.2d at 149 (recog-

nizing that there are three factors [7] *"to be considered* when assessing the trial court's discretion in determining whether to order a release of an exemption" (emphasis added)); *Lamon,* 611 N.E.2d at 159 (stating that there are three factors "to be considered"); *cf. Eppler v. Eppler,* 837 N.E.2d 167, 179 (Ind.Ct.App.2005) (concluding the trial court did not abuse its discretion in declining to order the wife to execute a waiver of her right to an exemption where the husband "fail[ed] to specifically demonstrate the tax consequences to the parties if the exemption were transferred and, most importantly, how such transfer would benefit the children"), *trans. denied; Harris,* 800 N.E.2d at 940 (reversing trial court's decision to order the mother to execute a waiver of the tax exemption where the record did not support a finding that Father would benefit from the exemption); *Glover v. Torrence,* 723 N.E.2d 924, 938 (Ind. Ct. App. 2000) (citing the five factors and concluding the trial court did not abuse its discretion based on the trial court's finding that the exemption "would serve to reduce the tax liability in Mother's Household").

Here, the trial court's findings do not indicate that it considered the relevant factors, even though Father introduced evidence relating to these factors. Father has also made some showing that his holding the exemption will benefit the children, as he has custody of one child, for whom he supplies a car, and exercises substantial parenting time with the rest of his children. *See Sims,* 770 N.E.2d at 867 (recognizing that "the noncustodial parent bears the burden of demonstrating … how such a transfer would benefit the child[ren]").

On remand we direct the trial court to reconsider its decision regarding the tax exemptions in light of the factors discussed above and our observations regarding these factors. We also direct the trial court to make specific findings with regard to its decision. *See Shafer v. Lambie,* 667 N.E.2d 226, 232 (Ind.Ct.App.1996) (remanding with instructions that the trial court enter specific findings of fact to support its decision); *cf. Skinner,* 644 N.E.2d at 150 (remanding with instructions that the trial court conduct a new hearing to address the relevant factors and determine whether to order mother to execute a waiver of tax exemption).

### IV. Overpayment of Child Support Arrearage

It is undisputed that Father overpaid his arrearage by $2,693. Father claims that "[t]he overpayment was involuntary as a result of tax intercepts." Appellant's Br. at 24. Mother first argues that Father "failed to properly present sufficient evidence to the trial court to support any finding that his overpayments were occasioned by tax intercepts," and appears to

---

**7.** *Skinner* and *Lamon* did not cite the current comment regarding tax exemptions. Prior to March 1, 1993, the Guidelines stated merely: "Development of these Guidelines did not take into consideration the awarding of the income tax exemption. Instead, it is recommended that each case be reviewed on an individual basis and that a decision be made in the context of each case." *See* Child Support Guideline 5, Commentary (1992). *Lamon,* which was handed down on March 29, 1993, cited the 1992 version of the Guidelines and analyzed cases from other jurisdictions addressing tax exemptions and concluded that the "[f]actors to be considered therefore are whether the noncustodial parent will be paying the majority of the support, the relative incomes of the parties, and the tax consequences of divesting the custodial parent of the exemption." 611 N.E.2d at 159. *Skinner* did not cite the Guideline's Comment regarding tax exemptions, but instead cited and discussed the three factors identified *Lamon.* 644 N.E.2d at 149. We note, however, that the three factors identified in *Skinner* and *Lamon* cover substantially the same ground as the five factors identified in the Guideline's Comment.

argue that the overpayment was the result of his continuing payment towards the arrearage through his wage withholdings after the tax intercept. Appellee's Br. at 10. The trial court found:

> 7. That Petitioner paid support following the entry of the Court's dissolution decree and the evidence presented indicates that he was aware of the interception of his tax refunds in two separate years which were applied to his arrearage.
>
> 8. That Petitioner testified that he was aware of the fact that his arrearage was paid in full on February 7, 2006; and notice was provided to him by the Clerk of this Court.
>
> 9. That although aware of the satisfaction of his arrearage, Petitioner took no action to terminate the voluntary wage assignment, nor to seek modification or other relief from the Court for over a year until April 18, 2007 when he filed several motions concerning emancipation, support and custody.

Appellant's App. at 10–11. Based on these findings, the court concluded:

> 6. That the overpayment made by Petitioner was voluntary as he had requested the Court to withhold the wages from his pay and despite becoming aware of the fact that he was current in February, 2006; he took no action whatsoever to stop the voluntary wage assignment of wages; nor to seek other relief from the Court.
>
> 7. That equity and fairness dictate that his overpayment should be considered a

gift in light of the facts and circumstances herein.

*Id.* at 12. Mother also argues that his claim is barred by laches. The trial court agreed, concluding:

> 8. That even were the Court to accept this overpayment as involuntary, Petitioner has waived or his claim is barred under the doctrine of laches as he asserted no reasonable excuse in asserting a right to reimbursement; acquiesced to the continued payment of this additional support for the next fourteen (14) months; the Respondent who was not notified of this arrearage payment in full continued to use the money received for the support of the children, especially when considering that in the interim period (August, 2006), she was required to pay off an additional business debt discharged by Petitioner in his bankruptcy using funds that may otherwise have been available for the support of the children.

Appellant's App. at 13.

## A. Laches [8]

In order for the defense of laches to apply, the party claiming laches must establish three elements: "inexcusable delay in asserting a right, implied waiver from knowing acquiescence in existing conditions, and circumstances resulting in prejudice to the adverse party." *Huber v. Sering*, 867 N.E.2d 698, 710 (Ind.Ct.App. 2007), *trans. denied.* "Prejudice may be created if a party, with knowledge of the relevant facts, permits the passing of time to work a change of circumstances by the

---

8. We note the general rule that laches does not apply to child support cases. *See Paternity of J.A.P. ex rel. Puckett v. Jones*, 857 N.E.2d 1, 10 (Ind.Ct.App.2006), *trans. denied.* However, this rule is based on the rationale that "Indiana courts will not penalize a child for his or her parent's delay in pursing child support." *In re Paternity of P.W.J.*, 846 N.E.2d 752, 759 (Ind.Ct.App.206), *clarified on reh'g*, 850 N.E.2d 1024. This rationale does not apply to situations where a parent seeks credit or reimbursement for overpayment of child support. *See id.* at 761. Therefore, in the proper case, laches can serve to bar a parent from receiving credit for overpayment of child support.

other party." *Gleeson v. Preferred Sourcing, LLC,* 883 N.E.2d 164, 180 (Ind.Ct. App.2008). "Mere inconvenience is insufficient to establish prejudice." *Ind. Real Estate Comm'n v. Ackman,* 766 N.E.2d 1269, 1274 (Ind.Ct.App.2002). The party claiming laches must demonstrate that it "altered [its] position in a detrimental manner." *Id.*

■ Here the trial court's findings and conclusions do not identify any prejudice caused to Mother by Father's delay. *See Shriner v. Sheehan,* 773 N.E.2d 833, 846–47 (Ind.Ct.App.2002) (concluding the trial court abused its discretion in finding laches where it "did not explain how [a party's] claim would be prejudicial, and [the court was] at a loss to see where prejudice lies"), *trans. denied.* The trial court's conclusion references the fact that Mother paid a debt of Father's that was discharged in bankruptcy.[9] In her appellate brief, Mother also argues that Father's "bankruptcy and resulting shifting of the burden of paying those obligations . . . constituted a change in circumstances." Appellee's Brief at 11. However, neither the trial court nor Mother explain how this change in circumstances has caused her prejudice with regard to Father's claim. Although Mother's circumstances may have changed, this change in circumstances did not deprive Mother of any claim or defense relating to Father's instant claims, and Mother can not show a nexus between this change and Father's delay.[10] Therefore, Mother cannot succeed on a claim of lach-

es. *See Ackman,* 766 N.E.2d at 1274; *In re Paternity of K.H.,* 709 N.E.2d 1033, 1036 (Ind.Ct.App.1999) (recognizing that although there had been a change in circumstances, there was no prejudice caused by this change in circumstances); *LaPorte Production Credit Ass'n v. Kalwitz,* 567 N.E.2d 1202, 1205 (Ind.Ct.App.1991) (concluding that the change in circumstances did not result in prejudice), *trans. denied; Fields v. Evans,* 484 N.E.2d 36, 39 (Ind.Ct. App.1985) (opinion on reh'g) (concluding laches was not available where party "did not plead or prove prejudice *arising from any alleged delay*" (emphasis added)); *cf. State ex rel. Atty. Gen. v. Lake Superior Court,* 820 N.E.2d 1240, 1256 (Ind.2005) (finding prejudice where a party waited three years to seek an injunction where the county was "now dependent on the results of that process to move forward"), *cert. denied,* 546 U.S. 927, 126 S.Ct. 398, 163 L.Ed.2d 276 (2005); *Oakes v. Hattabaugh,* 631 N.E.2d 949, 953 (Ind.Ct.App. 1994) (finding prejudice where a family built a home and purchased additional land in reliance on another's implied acquiescence to the family's violation of restrictive covenants), *trans. denied.* Mother has not explained, and we fail to discern, how Father's delay in filing the suit caused her any prejudice. Because the trial court's finding of prejudice is not supported by the evidence, we need not address the other elements of laches. *See Siddall v. City of Michigan City,* 485 N.E.2d 912,

9. It appears that after Father received a Chapter 7 discharge, two of Father's business creditors retained liens on the property owned jointly by Father and Mother during the marriage. Mother retained the property after the divorce. Mother decided to refinance this property on two occasions, February 2004 and August 2006. Both times, she was informed that she was required to first pay off a lien. Mother did not seek legal advice as to these claims, and paid roughly $3,200 in 2004 and roughly $2,600 in 2006.

10. Indeed, we find it hard to imagine a situation in which a party's circumstances will have remained absolutely static during a period of time. This element of laches would be hollow if it did not require that the change in circumstance was caused by the delay or worked some disadvantage toward the party in relation to the suit.

916–17 (Ind.Ct.App.1985) (reversing order of summary judgment based on laches where the defendant failed to show prejudice).

As the trial court's conclusion that laches barred Father's claim is clearly erroneous, we will also discuss the merits of his claim.

### B. Father's Request for Credit

Initially, we note that the trial court's findings regarding Father's overpayment contain both factual statements unsupported by the record and misstatements of the law. The trial court's findings and conclusions repeatedly refer to and rely on the voluntary nature of Father's wage assignment. We recognize that the parties agreed that "both the current support and arrears payment shall be accomplished by voluntary wage assignment." Appellant's App. at 3. However, the law requires that, absent a showing of extraordinary circumstances, "the court shall order that child support payments be immediately withheld from the income of the obligor." Ind.Code § 13–16–15–0.5(a).[11] Therefore, Father's decision to pay child support via wage withholding was voluntary only in the sense that Father voluntarily complied with the law.

Also, the trial court's finding that Father took no action for over a year after receiving notice that he had satisfied his arrearage is not supported by the evidence. Indeed, the record indicates that on February 17, 2006, just eight days after the trial court approved the order indicating that Father's arrearage was paid in full, Father's support payments decreased from $742 per paycheck to $690 per bi-weekly paycheck. *See* Appellant's App. at 30–31. This decrease clearly indicates

that Father was no longer paying the $25 per week toward his arrearage. True, Father did not file the instant petition until more than a year after learning that he had satisfied his arrearage, but he clearly did not wait a year to ensure that he was not paying more than required.

As the trial court's conclusion that Father is not entitled to credit is based on clearly erroneous factual findings and legal reasoning, under our standard of review we must reverse this part of the trial court's order as well. However, as the trial court is required to issue a new support order on remand, we will address the legal principles implicated by Father's request for credit.

Under most circumstances, Indiana courts "prohibit[ ] child support obligors from attempting to satisfy their future support responsibilities through non-conforming payments that exceed the amount owed the support recipient." *Brown v. Brown*, 849 N.E.2d 610, 615 (Ind. 2006). Therefore, "child support payments cannot be applied prospectively to support not yet due at the time of the overpayment." *Id.* (quoting *Drwecki v. Drwecki*, 782 N.E.2d 440, 448 (Ind.Ct.App.2003)). This rule "prevents a non-custodial parent from building up a substantial credit and then later refusing to make support payments, [as such a situation] 'would thwart the court's purpose of providing regular, uninterrupted income for the benefit of the children.'" *Id.* (quoting *Drwecki*, 782 N.E.2d at 448–49); *see State v. Funnell*, 622 N.E.2d 189, 191 (Ind.Ct.App.1993) ("One purpose of child support is to provide regular and uninterrupted support for the children."). Voluntary overpayments of child support are "properly treated as

---

**11.** This version of the statute was adopted in 2007. However, the previous version of this statute contained substantially the same re-

quirement. *See* Ind.Code § 31–16–15–1(a) (2006), *repealed by* P.L. 103–2007, Sec. 51.

[gratuities] to the children and no credit is granted." *Brown*, 849 N.E.2d at 615.

 However, this rule "does not fully apply ... where [a parent] did not voluntarily build up a substantial credit." *Drwecki*, 782 N.E.2d at 449. Therefore, where an overpayment is not voluntary, the amount may be credited to future child support payments. *Flowers v. Flowers*, 799 N.E.2d 1183, 1192 (Ind.Ct.App.2003) ("The amount of overpayment may then be credited to future child support payments to be made by [Father] or refunded by [Mother]."); *Drwecki*, 782 N.E.2d at 449–450 [12]; *cf. Best v. Best*, 470 N.E.2d 84, 88 (Ind.Ct.App.1984) (affirming the trial court's order that mother repay father the amount of overpayment for their daughter's educational expenses induced by mother's fraudulent misrepresentations).

 Here, all of Father's payments were made pursuant to wage assignments and tax intercepts—manners that clearly conform to the parties' agreement and court orders. *Cf. O'Neil v. O'Neil*, 535 N.E.2d 523, 524 (Ind.1989) ("[A]n obligated parent will not be allowed credit for payments not conforming to the support order."). As soon as Father received notice that he was current on his arrearage, he took steps to reduce the amount withheld from his bi-weekly paycheck. In sum, nothing in the record indicates that Father voluntarily overpaid his support obligation. We conclude Father's overpayment was not voluntary, and therefore is not subject to the general rule that overpayment of child support is inherently considered a gift. *See Matson v. Matson*, 569 N.E.2d

732, 734 (Ind.Ct.App.1991) (concluding that an "excess amount withheld [through a tax-intercept] should have been paid to [the father]").

 Still, the question remains as to whether Father is entitled to reduced future support payments. Our reading of the federal tax-intercept law indicates that, if Father overpaid as a direct result of a federal tax intercept, he is not. The tax-intercept law allows a State agency to notify the Secretary of the Treasury "that a named individual owes past-due support which has been assigned to such State," and in turn directs the Secretary to withhold from that individual's tax refund "an amount equal to the past-due support." 42 U.S.C. § 664(a)(1). The Secretary then sends this amount to the State agency. *Id.* Therefore, "[t]he tax-intercept law essentially directs the Secretary to give priority to a State's claim for recoupment of welfare payments made to a family who failed to receive child support ... over an individual's claim for refund of tax payment." *Sorenson v. Sec. of Treas.*, 475 U.S. 851, 856, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986).

 In response to due process concerns, Congress amended the Social Security Act in 1984 to ensure that the collection of child support through tax-intercepts satisfied due process. *See generally*, Faye R. Goldberg, Note, *Child Support Enforcement: Balancing Increased Federal Involvement With Procedural Due Process*, 19 SUFFOLK U.L. REV. 687, 711 (1985). In addition to adding notice and hearing

---

**12.** In *Drwecki*, this court allowed a parent to recoup his overpayment on the following specific facts:

1) the petitioning parent has stayed current on his support obligation such that little arrearage exists; 2) the petitioning parent continued to follow the trial court's previous order despite a change in circumstances justifying a decrease in the support obligation; and 3) the trial court modified support to a time after the petition was filed.

782 N.E.2d at 449–50.

requirements, the 1984 amendments added a provision to section 664 that stated:

> In any case in which an amount was withheld under paragraph (1) or (2) and paid to a State, and the State subsequently determines that the amount certified as past-due support was in excess of the amount actually owed at the time the amount withheld is to be distributed to or on behalf of the child, the State shall pay the excess amount withheld to the named individual thought to have owed the past-due support (or, in the case of amounts withheld on the basis of a joint return, jointly to the parties filing such return).

42 U.S.C. 664(a)(3)(D). This section indicates that obligated parents should not pay more than required because of the tax-intercept program. *See Matson,* 569 N.E.2d at 734. However, the statute's plain language indicates that it is the *State* that is responsible for reimbursing a parent who has been deprived of an amount of his or her tax refund.[13]42 U.S.C. § 664(a)(3)(D) ("the State shall pay the excess amount withheld . . ."); *see also* 45 C.F.R. § 303.72(h)(4) ("If the amount collected is in excess of the amounts required to be distributed under section 457 of the Act, *the IV–D agency* must repay the excess to the noncustodial parent whose refund was offset or to the parties filing a joint return within a reasonable period in accordance with State law." (Emphasis added)); 49 FR 36780–01, 36790 ("Section 464(a)(3)(D) of the Act requires *a State*, in any case in which an amount is offset and the State subsequently determines that

the amount certified for offset was in excess of the amount owed at the time of offset, to pay the excess to the absent parent or, in the case of amounts withheld on the basis of a joint return, jointly to the parties filing the return." (Emphasis added)). Therefore, if indeed an amount of Father's tax refund was withheld improperly, his complaint is not with Mother, but with the State of Indiana. *See Howard v. Howard,* 130 Wis.2d 206, 387 N.W.2d 96, 97 (Wis.Ct.App.1986) (recognizing that "this action is not the effort of [father's] ex-wife to enforce payment of arrearages. Rather, it is the effort of a state child support agency . . . to intercept federal tax refunds as provided by law."); *cf.* 26 C.F.R. § 301.6305–1(d)(3) ("This paragraph (d) [indicating that federal courts do not have jurisdiction to hear any action regarding the assessment or collection of certified amounts through tax-intercepts] does not preclude a State court or appropriate State agency . . . from exercising jurisdiction over a legal, equitable, or administrative action against the State by an individual to determine his liability for any certified amount assessed against him and collected." (Emphasis added)); *Satorius v. U.S. Dep't of Treas.—I.R.S.,* 671 F.Supp. 592, 595 (E.D.Wis.1987) ("The plaintiff's complaint primarily challenges the validity of the underlying child support obligation assessed by [the County] and seeks damages and injunctive relief for the alleged wrongful interception of the plaintiff's tax refund. The tax refund has been transferred to a state agency and the

---

**13.** Father relies heavily on *Matson* in arguing that he should receive a future credit. Although *Matson* does not explicitly state that the father in that case should receive credit on future payments, the opinion implies as much, as it reverses the trial court's order denying the father credit. Although we agree with the *Matson* court's conclusion that the overpayment was not "voluntary," we disagree with its implication that the custodial parent should receive reduced future payments as a result, as the plain language of the federal statute clearly states that the State shall pay the excess amount withheld to the noncustodial parent.

plaintiffs should litigate these claims in state court.").

However, the record is not clear as to whether an excess amount was withheld pursuant to the tax-intercept. It appears possible that Father did not begin to overpay until after the last tax-intercept.[14] If so, we are apparently faced with a situation where, due to delays in the notification process, neither Father nor Mother had received notice that Father had satisfied his arrearage until he had overpaid by $2,693. Although the parties clearly had some obligation to keep track of Father's payments to determine when the arrearage was satisfied, we express dismay that the system established by the State allows such a result. The State has clearly indicated that it prefers noncustodial parents to pay child support through wage withholding. The State therefore must take some responsibility in keeping track of such payments and notifying parents when they have met (or have failed to meet) such obligations.

In situations where the State does not promptly inform parents of an arrearage's satisfaction and a parent overpays, two options seem apparent: 1) reduce the noncustodial's parent's future payments, thereby depriving the children of the regular amount needed to support them; or 2) leave the noncustodial parent with no recourse through the custodial parent for the amount by which he has overpaid through the processes established by Congress and our legislature. Neither of these options is particularly desirable.[15]

On remand, if the trial court determines that the overpayment occurred after the tax-intercept, it is left with the task of weighing the equities and determining whether some reduction of future support payments is proper. In making this determination, the trial court should consider both the importance of payments' "regularity and continuity," and their "overall dollar amount," as these considerations are "equally important." *Haycraft v. Haycraft*, 176 Ind.App. 211, 216, 375 N.E.2d 252, 255 (1978).

### Conclusion

We conclude that the trial court's conclusion that B.C. is "partially emancipated" is clearly erroneous, and remand with instructions that the trial court terminate Father's child support obligation with regard to B.C. We also conclude that the trial court's findings and conclusions do not support its judgment with regard to the tax exemptions or Father's overpayment, and instruct the trial court to issue a new order consistent with this opinion.

Reversed and remanded.

BAKER, C.J. and RILEY, J., concur.

14. On remand, the trial court should make a specific finding as to how this overpayment occurred.

15. We note the possibility that the noncustodial parent could have some recourse through the State. However, without statutory authorization for such an action, or caselaw indicating that such an action is sustainable, we make no statement as to whether such an action would be permitted or ultimately successful.