Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 16 2013, 8:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATTI J. TAYLOR**
Taylor Law Office, P.C.
Warsaw, Indiana

ATTORNEY FOR APPELLEE:

**MICHAEL W. REED**
Reed & Earhart Attorneys at Law, P.C.
Warsaw, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DAVID DELONG, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 43A03-1206-DR-299 |
| | ) | |
| KIM DELONG, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE KOSCIUSKO CIRCUIT COURT
The Honorable James R. Heuer, Special Judge
Cause No. 43C01-0810-DR-503

April 16, 2013

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

David DeLong ("Father") appeals from the trial court's custody determination and child support calculation in the dissolution of his marriage to Kim DeLong ("Mother"), as well as from the court's order on his motion to correct errors. Father raises three issues, which we revise and restate as:

I.  Whether the court's findings regarding the custody of Wh.D. and We.D. were clearly erroneous;

II.  Whether the court's child support calculation was clearly erroneous; and

III.  Whether the court abused its discretion in appointing, as amended in its order on Father's motion to correct errors, a Parenting Time Coordinator.

We affirm in part, reverse in part, and remand.

FACTS AND PROCEDURAL HISTORY

Father and Mother were married on April 25, 1998, and two children were born to the marriage: daughter Wh.D. in January 2004 and son We.D. in November 2005. They lived at a residence in Leesburg, Indiana, for the balance of their marriage, and Father was employed with DePuy Orthopedics as a Business Relationship Manager.[1] On October 3, 2008, Mother filed a petition for dissolution of marriage, and on October 10, 2008, a provisional order was entered by agreement of the parties establishing temporary custody with Mother, Father having parenting time pursuant to the Indiana Parenting Time Guidelines (the "Guidelines"). The provisional order also assigned to Father possession of the marital residence.

---

[1] At the final hearing held on August 23, 2011, Father testified that he was earning approximately $120,000 in annual base salary plus a performance-based bonus.

2

On October 16, 2008, Mother filed a Verified Motion to Modify Provisional Orders to restrict Father's parenting time due to his "recent conduct and actions," also noting that Father "lacks stability," and specifically asking that Father's parenting time not include overnights or extended holiday parenting time. Appellant's Appendix at 41. In December 2008, Mother was hired as an assistant branch manager at a bank in which she was paid $1,350.00 every two weeks, with the possibility of bonus pay. On February 10, 2009, Father filed a Motion to Modify Provisional Orders, and on March 4, 2009, the court entered a modification order stating that, with the exception of Mother's change in employment status, there had not been a change in circumstances making the existing provisional order unreasonable, and concluding that the provisional order would remain in full force and effect. The order also stated that Father was to pay $458.31 per week in child support, as well as 16% of any gross amount from bonus pay.

On May 11, 2009, Mother filed a motion to determine extended parenting time, stating that Father has requested half of the summer for extended parenting time, that the Guidelines provide for half of summer "vacation" for children five years or older, that although Wh.D. is five years old she has not attended school and accordingly is not on "vacation," and that it is not in the children's best interest to allow Father to have extended parenting time at this time. Id. at 46. On May 28, 2009, the parties agreed to a summer parenting time schedule which included thirty overnights for Father, and this schedule was filed with the court the following day. On September 14, 2009, Father filed a motion for custody evaluation or psychological/parenting evaluation, and on September 29, 2009, Mother filed an objection to Father's motion.

3

On October 26, 2009, Mother filed a Motion to Restrict Parenting Time and stated that Father took the children on a cruise during his extended parenting time and only notified Mother of his plans via an email sent the day the trip commenced. On December 8, 2009, Father filed a Motion to Modify Provisional Order as to Custody and Parenting Time which noted that Mother had filed her third formal request to reduce or restrict Father's parenting time, that Father fully complied with the Guidelines regarding the cruise, that Mother has interpreted the Guidelines as a "maximum" and does not allow Father additional parenting time for certain occasions, and that Mother has refused to engage in discussions concerning decisions affecting the children. Id. at 54. He requested that the court modify custody to joint legal custody, that he receive additional parenting time during the week, and that the court grant his motion for custody evaluation or psychological/parenting evaluation.

On December 22, 2009, Mother filed a request for the court to appoint a custody evaluator, and on February 9, 2010, the court issued an order stating that the parties stipulate and agree to a custody evaluation by Dr. Stephen Ross. On March 1, 2010, Father filed his Verified Emergency Motion to Terminate Counseling and for Independent Evaluation stating that Mother had been taking We.D. to meet with Donald Munn of Crystal Valley Professional Consultants for counseling without consulting with Father, that neither Mother nor Mr. Munn would allow Father access to the counseling records, that Mr. Munn is not a child psychologist and is not qualified to evaluate or counsel a four-year-old child, and that Mother "is attempting to perpetuate allegations of sexual abuse . . . by [Father], the same which have been fully investigated by the police

4

and Department of Child Services and found to be unsubstantiated." Id. at 58. On March 9, 2010, following a conference call, the court denied Father's motion.

On December 9, 2010, following various filings by the parties, the court issued an order in which it observed at the outset:

> The Court has taken under advisement [Mother's] Motion to Enforce Court's Order; Objection and Request for Sanctions as to Non-Party Request for Production; Motion to Restrict Parenting Time as well as [Father's] Motion to Modify Provisional Order as to Custody and Parenting Time; Motion for Credit to Child Support Obligation; Objection and Request for Sanctions as to Non-Party Discovery; and Request for Further Ruling on Motion to Modify Child Support.

Id. at 60. In the order, the court made twenty findings, including that custody issues should be reserved until Dr. Ross's custody evaluation had been completed, that Mother has not demonstrated any potential harm such that Father's parenting time should be restricted, that Father may continue to exercise parenting time as provided in the Guidelines, and that, further, Father's "Wednesday evening parenting time may be overnight . . . ." Id. at 61.

On December 21, 2010, Father filed a Verified Information in Contempt, with proposed Rule to Show Cause and Citation for Rule to Show Cause.[2] On December 29, 2010, Mother filed a motion to correct errors objecting to the court's December 9, 2010 order allowing Father to exercise Wednesday overnight parenting time, arguing that it would be detrimental to the best interests of the children because they "have expressed their extreme fear and reluctance to spend any additional overnights" with Father. Id. at 63. Then, on January 4, 2011, Mother filed an Emergency Motion for Modification of

---

[2] A copy of this motion is not contained in the record.

5

Midweek Visitation Order stating that the court's order regarding Wednesday overnights was in error and noting that Father's midweek parenting time during the past two years had been on Tuesday evenings and that the children have been "enrolled in SPLASH – a program on Wednesday evenings through the North Webster Church of God, and have been for over two (2) years," and that Father has stated he will not take the children to the SPLASH program. Id. at 64.

On January 7, 2011, Father filed his Response to Motion to Correct Errors; Response to Emergency Motion for Modification of Midweek Visitation Order; and Motion to Correct Errors. First, Father stated that Mother's arguments in her motion to correct errors were the same as at the recent hearing and that her allegations that "the children have made statements concerning their Father" are not supported by evidence and specifically noted that the "records of Donald Munn reflect positive statements by [We.D.] concerning time spent with [F]ather." Id. at 68. In response to Mother's emergency motion for modification, Father argued that he has never said that he would not take the children to SPLASH, that he never refused to exercise overnight parenting time on Tuesdays, and that his intent was to comply with the court's orders. Father detailed an exchange with Mother as follows:

> 9. [Father] consistently communicated to [Mother] that if he was going to exercise overnights on Tuesday nights, there would need to be a written stipulation, and requested she have her attorney contact his attorney. [Mother] agreed this would be done, however, no written proposal was received. A series of emails between the parties marked as "Exhibit A," demonstrates [his] attempt to communicate the need to comply with the Court's Order until an alternate agreement was put in writing. [Mother] informed [Father] that his overnight parenting time would be on Tuesdays and stated that "Its Tuesday night or nothing" in her text message. [Father]

6

was further informed that if he wanted to have any midweek parenting time, he had better pick up the kids on Tuesday.

10. After [Father] picked up the children on Tuesday, January 4, 2011, at the insistence of [Mother] and her attorney, [Mother's] attorney sent a letter to the undersigned stating now that [Father] has picked up the children, if he wanted to exercise his overnight parenting time we were to advise accordingly and, if not [Father] was to return the children to [Mother] not later than 9:00 PM. Attorney Lennox's letter further stated [Father] would NOT be permitted to have parenting time on Wednesday, January 5, 2011. . . .

\* \* \* \* \*

12. [Mother] did not pick up the minor children from [Father] on Tuesday evening, January 4, 2011 as is required under the Guidelines for sharing the transportation burden, and she proceeded to send numerous text messages to [Father] that by not bringing the children to her home, he was choosing to exercise his overnight on Tuesday nights. [Mother] also sent [Father] a text earlier stating her intent to *deny* [Father] his parenting time on Wednesday, January 5, 2011, for [Wh.D.'s] birthday. . . .

13. On Wednesday evening, January 5, 2011 at 7:40 PM, while [Father] was exercising parenting time for [Wh.D.'s] birthday, [Mother] contacted the Kosciusko County Sheriff's Department. At 8:15 PM, [Mother] and her brother . . . came to the door of [Father's] residence, along with a Sheriff's Deputy, and demanded to have the minor children. After the Deputy reviewed the Court's Order and advised [Mother] he could not make [Father] give her the children, [Mother] demanded to see the children. [Father] kept the children occupied in the lower level of the former marital residence to prevent their exposure to this situation.

Id. at 69-70. Father's motion to correct errors also challenged the court's calculation of child support and specifically noted bonus income earned by Mother which had not been taken into account. On January 11, 2011, Mother filed an Information in Contempt stating that Father was in "indirect contempt of the plain meaning and intent of the Court's Orders" when he kept the children overnight on both Tuesday and Wednesday. Id. at 67. On January 31, 2011, the court entered an agreed order modifying the regular

7

midweek parenting time to Tuesdays instead of Wednesdays and noting that "[t]he parties will continue to be flexible with [Father's] midweek parenting time with respect to work obligations and the childrens' [sic] activities." Id. at 78.

On April 20, 2011, the court held a pretrial conference and indicated in its chronological case summary ("CCS") that Dr. Ross's custody evaluation was admitted into evidence by stipulation of the parties. On August 23, 2011, the court held a final hearing on the petition for dissolution and, at the outset, admitted the deposition and counseling notes of Claudia Davis, who was hired by Father in June of 2009 to provide counseling to Wh.D. because she "was becoming increasingly aggressive," and at which Mother, Father, and Wh.D. were present. Id. at 380. Mother testified on cross-examination that her statements in Dr. Ross's report that she thought Father should be limited to supervised visitation were "a little harsh" and she agreed that Father should participate in the lives of the children and have parenting time. Transcript at 148. Mother testified that Father has worked from home on multiple occasions when school was either closed or the children were sick.

Dr. Ross testified that he is a Board Certified Clinical and Forensic Psychologist and was hired to conduct a custody evaluation in the matter. He testified that, in that capacity, he conducted interviews of Mother and Father, as well as the children, Mr. Munn, and Ms. Davis, and he visited the homes and obtained other data. Dr. Ross testified that he did not find any evidence that the children were afraid to spend time with or did not want to see Father, and he specifically testified that "the kids have told [him] that they want to spend more time with their father." Id. at 317. Dr. Ross testified

8

regarding his custody evaluation, specifically detailing psychological testing he performed on Mother and Father. He stated that he believed that Mother's continued beliefs regarding Father's purported molestation of We.D. were unfounded and erroneous, that Mother's conduct could lead to "parental alienation" of Father, which he defined as when one parent "may be, either consciously or unconsciously . . . influencing a child's view of the other parent in a negative manner and then that having a negative affect [sic] on the child and then on the targeted parent," and which could be seen as a form of child abuse, and that "based upon the premise of who, which parent would be more likely to foster positive relationships of the other parent," he would be "more inclined to nominate" Father as the legal custodian of the children. Id. at 302, 315-316. Dr. Ross also recommended that Tara Porter be hired as a parenting coordinator with Level 3 authority to assist the parents. He also recommended a shared physical custody arrangement which rotated on a weekly basis.

On August 24, 2011, at the conclusion of the final hearing, the court took the matters under advisement and ordered the parties to submit proposed findings and decree. On January 20, 2012, the court entered its Decree of Dissolution (the "Dissolution Decree") containing thirty-one findings determining all of the pending matters and awarding joint legal custody and primary physical custody to Mother, with Father receiving parenting time pursuant to the Guidelines plus a weeknight overnight. The court also issued a Child Support Obligation Worksheet ("CSOW") which credited Father with ninety-eight overnights and stated that Father's weekly child support payments were calculated to be $319.

9

On February 16, 2012, the parties filed a proposed Agreed Modification Order which reduced Father's child support obligation from $319.00 per week to $288.00 per week because the court's previous calculation erroneously included $40 per week in child care expenses. The next day, Father filed a Motion to Correct Errors challenging certain findings of the Dissolution Decree, namely, Findings 14, 17, 20, 21, 22, 24, 25, and 30. The court entered the Agreed Modification Order on February 22, 2012. On March 5, 2012, Mother filed her Statement in Opposition to Motion to Correct Errors. On April 13, 2012, Father filed a Verified Information in Contempt and Motion to Modify Custody stating that Mother signed We.D. up for soccer without consulting Father and did not list Father as an emergency contact despite the fact that Father and Mother were awarded joint legal custody. On May 3, 2012, the court held a hearing and issued an order stating that Mother should have consulted Father about signing We.D. up for soccer, that "it does appear that such a discussion would have been an exercise in futility," that Mother should also have advised Father about a recent doctor appointment for We.D., that Mother shall list Father as an emergency contact on all registration information, and that Mother's conduct does not rise to the level of contempt. It also took Father's motion to correct errors under advisement.[3]

On June 1, 2012, the court issued its order on Father's motion to correct errors (the "June 1, 2012 Order"), which vacated Finding 17,[4] clarified Finding 21 by including

---

[3] The order also addressed Mother's motion, dated April 20, 2012, regarding summer parenting time and ordered that Father's summer parenting time was to conclude on August 12, 2012.

[4] Finding 17 stated: "The age, although not the gender, of the children support placement with [Mother], as the children are still of a somewhat tender age, and [Mother] has acted as the primary physical caregiver throughout the children's young lives." Appellant's Appendix at 30.

Finding 21A, and amended Finding 22. Father subsequently appealed. Additional facts will be provided as needed.

STANDARD OF REVIEW

The trial court apparently entered *sua sponte* findings of fact and conclusions thereon. In general, *sua sponte* findings control only as to the issues they cover, and a general judgment will control as to the issues upon which there are no findings. <u>Yanoff v. Muncy</u>, 688 N.E.2d 1259, 1262 (Ind. 1997). When a trial court has made findings of fact, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. <u>Id.</u> Findings will be set aside if they are clearly erroneous. <u>Id.</u> "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." <u>Id.</u> A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. <u>Id.</u> To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made. <u>Id.</u> "A general judgment entered with findings will be affirmed if it can be sustained on any legal theory supported by the evidence." <u>Id.</u> As we conduct our review, we presume the trial court followed the law. <u>Rea v. Shrover</u>, 797 N.E.2d 1178, 1181 (Ind. Ct. App. 2003). It is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal. <u>Id.</u>

Also, we generally review rulings on motions to correct error for an abuse of discretion. <u>Ind. Bureau of Motor Vehicles v. Charles</u>, 919 N.E.2d 114, 116 (Ind. Ct. App.

11

2009); <u>Speedway SuperAmerica, LLC v. Holmes</u>, 885 N.E.2d 1265, 1270 (Ind. 2008), <u>reh'g</u> <u>denied</u>. An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before it, or the reasonable inferences drawn therefrom. <u>Lighty v. Lighty</u>, 879 N.E.2d 637, 640 (Ind. Ct. App. 2008), <u>reh'g</u> <u>denied</u>.

ISSUES AND DISCUSSION

I.

The first issue is whether the court's findings regarding the custody of Wh.D. and We.D. were clearly erroneous. A trial court's custody determination is afforded considerable deference as it is the trial court that sees the parties, observes their conduct and demeanor, and hears their testimony. <u>Kondamuri v. Kondamuri</u>, 852 N.E.2d 939, 945-946 (Ind. Ct. App. 2006). Thus, on review, we will not reweigh the evidence, judge the credibility of witnesses or substitute our judgment for that of the trial court. <u>Id.</u> at 946. We will reverse the trial court's custody determination only if it is clearly against the logic and effect of the facts and circumstances or the reasonable inferences drawn therefrom. <u>Id.</u>

Initially, we recite the relevant findings which, as noted below, are challenged by Father on appeal:

> 14. The parties have conducted themselves in a less than reasonable manner as to the best interests of the children, engaging in gamesmanship, character assassination, and immature tactics to harm the other parent and diminish the children's enjoyment of their childhood.

* * * * *

12

19. The children have adjusted very well to their change in residence from the former marital residence as reflected in their scholastic achievement and participation in extracurricular activities, and therefore such change in residence has not affected the children negatively as they continue to thrive in [Mother's] custody.

20. The mental health of both parents is questionable, however, there is nothing in the record which would suggest that either parent is a danger to the children or incapable of providing an appropriate upbringing.

21. Given the record herein, and the consideration of the appropriate statutory factors, the Court finds that it is in the best interest of the minor children that the parties be awarded joint legal custody, with primary physical custody awarded to [Mother]. [Father] shall have regular parenting time pursuant to the Parenting Time Guidelines. The midweek parenting time shall be on Tuesday evening. At his election [Father's] midweek parenting time may be an overnight. Regardless of [Father's] exercise of midweek overnights, 98 overnights shall be utilized for support computation purposes.

Appellant's Appendix at 30-31. Also, as noted above, the court clarified Finding 21 in its

June 1, 2012 Order in Finding 21A as follows:

21A. Dr. Stephen Ross performed a custody evaluation in these proceedings wherein he recommended that the parties share physical custody on a 50/50 basis. The Court disagrees with this recommendation for reason that there was significant evidence that [Father] has become reclusive since the parties' separation, limiting the children's interactions with other children when they are in his care. Thus, the Court has awarded primary physical custody to [Mother].

Id. at 26.

Father begins by noting that the Dissolution Decree "essentially adopted the proposed Decree of [Mother] with minor changes" which warrants "cautious appellate scrutiny" by this court. Appellant's Brief at 17 (quoting Carpenter v. Carpenter, 891 N.E.2d 587, 592 (Ind. Ct. App. 2008)). Father argues that one similarity between Mother's proposed decree and the court's Dissolution Decree "is the absence of any

13

mention of the fifty-six page Custody Evaluation agreed upon and ordered by the Court, or the testimony of the only expert witness at trial, the custody evaluator, Dr. Stephen Ross," and Father notes that following the motion to correct errors hearing, the court added as Finding 21A an acknowledgement of Dr. Ross's custody evaluation and specifically its recommendation "that the parties share physical custody on a 50/50 basis" but that the court disagreed because "there was significant evidence that [Father] has become reclusive since the parties' separation, limiting the children's interactions with other children when they are in his care." Id. at 17-19.

Father argues that the only evidence of such reclusiveness in the record was the testimony of Mother's friend Pam Walker. Father argues that other friends of Mother testified that they do not invite the children over to play when they are with Father, but this "does not support the Trial Court's conclusion that *Father* is 'limiting the children's interactions with the other children'" and is "more indicative of how Mother speaks about Father to her friends in such a way as to influence those friends . . . *n*ot [sic] to include the [] children when they are with their Father . . . ." Id. at 30. Father also argues that he "refuted these allegations . . . stating, 'for every Pam Walker I've got 4 friends that do not believe that' and that any claim that [he] is isolating himself or covering his windows is ridiculous." Id. at 31.

Father argues that in addition to the finding regarding his purported reclusiveness, there were three other findings "upon which the Trial Court appeared to rely in determining custody" which were not supported by the evidence. Id. at 19. First, Father points to Finding 14 which states that "[t]he parties have conducted themselves in a less

14

than reasonable manner as to the best interests of the children" and have engaged in "gamesmanship, character assassination, and immature tactics to harm the other parent," and he argues that although the record is replete with evidence of Mother engaging in such tactics, the use of such tactics which are attributable to Father is not so contained. Id. Specifically, Father points to instances in the record as indicative of Mother's behavior including: (1) Father exercised parenting time on Wednesday in compliance with the December 2010 order which was an apparent error as the overnight was supposed to be on Tuesday, and Mother characterized Father's behavior as "being a 'game;'" (2) Mother complained that Father did not adequately notify her when he took the children on a cruise, she filed the Motion to Restrict Parenting Time as a result, and Mother told Father that "she would get even with him" and "within two days of Father's return . . . accused Father of molesting their son;" (3) Mother had law enforcement personnel run the license plate of a vehicle parked at Father's home; (4) Mother alleged that Father molested We.D., took the children to the police station to be interviewed, to the Department of Child Services, and she took We.D. to a counselor at her church "in an attempt to substantiate her allegations," called Father "a 'frickin' child molester' in the presence of the children," and continues to harbor such beliefs despite a lack of evidence of abuse; (6) Mother alleged to day care personnel that Father was drugging the children with medication when they were not ill; (7) Mother has repeatedly alleged to Claudia Davis that the children were in "extreme fear" of Father and did not want to visit him; (8) Mother has denied Father, with two exceptions, his requests to exercise parenting time beyond the minimum as ordered and has repeatedly stated her belief that his parenting

15

time should be limited and supervised. Id. at 20-23. Father argues that Dr. Ross in his custody evaluation concluded that Mother's behaviors "were so egregious, they rose to the level of parental alienation causing harm to the children," and Dr. Ross recommended a 50/50 arrangement in order to preserve Father's relationship with the children. Id. at 23.

Father next points to Finding 19 which states in part that "[t]he children have adjusted very well to their change in residence . . . as reflected in their scholastic achievement and participation in extracurricular activities," and argues that although he agrees that his children are intelligent and have performed well in school, "it is difficult to understand the Trial Court's conclusion of 'scholastic achievement' in preschool through First Grade as proof that they have adjusted well" and notes that the "children don't even receive grades" at such early levels of schooling. Id. at 25. Father argues that "[t]he record reflects the children were in counseling for most of the pendency of the dissolution action" and specifically notes that Claudia Davis recommended that Wh.D. continue in counseling to treat her "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." Id. Father also notes that Dr. Ross recommended that the children remain in counseling until after the divorce was final.

Finally, Father turns to Finding 20 which states that "[t]he mental health of both parents is questionable" and argues that although Mother's mental state is in question, "the record contains evidence contrary to the finding that Father's mental health is questionable." Id. Specifically, Father notes that Dr. Ross performed psychological testing on both parents and "on all but one of the tests administered to Mother," the

16

results were invalid "due to the manner in which Mother answered." Id. at 28. Father argues that, "[b]y contrast, all of [his] psychological testing yielded valid results and functioning within normal limits, with the exception of an elevated score on the Spousal scale for the Parental Stress Index test reflecting difficulty interacting with Mother." Id.

Mother argues that substantial evidence appears in the record to support the trial court's findings related to custody, listed in the Dissolution Decree and order on Father's motion to correct error as Findings 14-22.[5] Mother notes that her home is appropriate for children, and the court heard testimony by witnesses "including the childrens' [sic] pre-school teacher, [Wh.D.'s] first grade teacher, neighbors, friends, and family members" to the effect that Mother and the children enjoy a "very positive and healthy relationship" and that "the children are well-adjusted and thriving, and doing remarkably well considering the issues between the parties." Appellee's Brief at 12. Mother asserts that the evidence showed that the children have done well in school and appear happy, healthy, and well behaved. Mother contends that her extended family and her significant other have a good relationship and are positive influences on the children.

Mother maintains that evidence was presented "that it would be difficult to co-parent with [Father] because he is a very controlling person." Id. at 13. Mother notes, however, that she "promised the court that she would attempt to consult with [Father] better in the future" regarding extracurricular activity decisions, among other things and noted the importance that "he remain active and important in their lives." Id. at 14. Mother argues that, to the extent Father alleges that she has not generally agreed to

_____

[5] As Mother correctly observes in her brief, the court vacated Finding 17 and it does not bear on the issues on appeal.

parenting time above what is allowed under the guidelines, such complaints "can be seen as further attempts on his part to impose his control over the custodial situation, to invoke his will, and to effect a defacto [sic] change in custody." Id. at 14-15.

Mother further argues that she is "concerned that [Father] is a homosexual and/or has a deviate sexual lifestyle," noting his arrest "for solicitation/public indecency," and that "although the charges were dismissed, it does not mean the incident did not take place or that legitimate concerns do not surround and arise from the incident." Id. at 15. Mother maintains that We.D.'s "allegations of sexual molestation by [Father] are a concern." Id.

Mother notes that the children's counselor, Claudia Davis, indicated in her deposition that it was in their best interests that Mother be awarded custody. Mother argues that to the extent Father asserts that the court disregarded Dr. Ross's custody evaluation and recommendations therein, "Indiana law is clear . . . that the fact-finder in a dissolution action is not required to accept the opinions of experts regarding child custody." Id. at 15-16 (citing Clark v. Madden, 725 N.E.2d 100 (Ind. Ct. App. 2000)). On that score, Mother asserts that Dr. Ross in his testimony also "informed the Court . . . that he saw nothing in his evaluation to indicate that [Mother] could not be an adequate parent, nor that she could not meet the physical needs of the children." Id. at 16. Mother contends that Father's arguments regarding custody merely invite this court to reassess witness credibility and reweigh evidence.

Father notes in his reply brief regarding Mother's "panoply of accusations from homosexuality, deviant sexual lifestyle, and child molestation," that "[n]ot only were

18

misdemeanor charges against Father dismissed, they were expunged and the officer involved was terminated from employment" and that "none of the mental health professionals . . . found any evidence to support Mother's multiple allegations . . . ." Appellant's Reply Brief at 4-5. Father argues that Mother's statements "concerning 'control issues' are only Mother's opinions and not supported by the evidence." Id. at 5. Father asserts that Mother's statement that Claudia Davis in her deposition recommended that the children remain with Mother was "untrue" and that she merely "rendered her, self-described, 'personal opinion' [sic] about Dr. Ross's recommendation for physical custody" which was "general and not specific to this case" that "preschool and early grade school children fair [sic] better [if] mother is the primary caregiver . . . ." Id. at 7.

After reviewing the arguments of the parties and the evidence presented, we cannot say that the court's custody determination was clearly erroneous. At the outset, we note that Father does not challenge Findings 15 and 18, which relate to custody. Specifically, Finding 18 states that "[t]he children have strong relationships with [Mother's] extended family, such that it is in the best interests of the children that those relationships continue to be fostered and that can best be served by placement with [Mother]." Appellant's Appendix at 30. Also, Finding 15 states that both parents "are capable caregivers to the children, are capable of providing the material necessities of the children and do not intentionally seek to do harm to the children." Id.

To the extent that Father challenges the court's decision to deviate from Dr. Ross's recommendation in his custody evaluation and award Mother primary physical custody, we note that as this court has observed, "the fact-finder is not required to accept the

19

opinions of experts regarding custody." Clark, 725 N.E.2d at 109 (citing Periquet-Febres v. Febres, 659 N.E.2d 602, 607 (Ind. Ct. App. 1995), trans. denied). The court found that Father has become reclusive which limits the children's ability to interact with others when they are in his care, and we observe that our standard of review dictates that the trial court was in the best position to judge the credibility of the witnesses called by the parties. We are in a poor position on appeal to examine such testimony. At trial, the court heard testimony from multiple members of the community including Pam Walker, who testified that the children were uncomfortable interacting with her when they were with Father, that she does not see him very much, and that the shades "always seem to be drawn and if we'd come around the garage would pop down." Transcript at 67. Further, we note that Father's attempt on appeal to refute this testimony was only his own testimony at the hearing that "for every Pam Walker I've got 4 friends that do not believe that," and he did not produce neighbors or parents of the children's friends to so testify. Appellant's Brief at 31 (quoting Transcript at 246).

We turn next to Finding 14, in which the court found that both parties have engaged in "gamesmanship, character assassination, and immature tactics to harm the other parent" and have conducted themselves in a manner which is not in the best interests of the children. We note that, as detailed by Father in his arguments, although the record was certainly rife with examples of such conduct attributable to Mother, Father is not correct that the record is entirely devoid of examples of him engaging in similar conduct. Indeed, we note that the court did not specifically find that the parties were equally to blame in this regard. Regarding such conduct attributable to Father, we

observe that Mother indicated at trial that Father made a report to Child Protective Services regarding Mother's decision to allow the children to go tubing on Wawasee Lake while wearing life jackets. Mother also testified that Father contacted the DNR regarding an incident in which Mother allowed We.D. to use a child-sized snowmobile under the supervision of her brother.

Further, we note that a specific incident during early January of 2011, in which Father and Mother had a disagreement about how to handle Father's overnight parenting time in light of the court's December 9, 2010 order which stated that Father was allowed to exercise parenting time on Wednesday evenings and may keep the children overnight, is emblematic of Finding 14. As detailed by Father's January 7, 2011 filing, Father picked up the children on Tuesday, January 4, 2011, based upon communications from Mother and Mother's counsel informing Father that he should exercise his parenting time on Tuesday rather than Wednesday evening because the children attend SPLASH on Wednesday evenings. Mother told Father via text message that his decision to keep the children on Tuesday evening was being interpreted by her as an understanding that the Tuesday night parenting time was being exercised in lieu of Wednesday evening, which the parties seemed to agree was erroneously stated in the December 9, 2010 order. However, on Wednesday Father ultimately relied on the court's order when challenged by Mother and the Sheriff's deputy and kept the children for a second, consecutive night.

To be clear, we find it unfortunate that Mother resorted to bringing a Sheriff's Deputy to Father's house on Wednesday evening with the intention of removing the children from Father's residence. This does not mean, however, that Father was

21

blameless for this series of events, and in any event we cannot say that the court's Finding 14 was clearly erroneous.

Next, to the extent that Father challenges Finding 19 that the children have performed well in school and participate in extracurricular activities, and that this demonstrates that they have adjusted to their change in residence, we observe that Father does not argue that the evidence relied upon by the court was misstated. Rather, Father argues that the children's level of schooling is too early in order to properly bear on whether they have adjusted to the residential change.

The record reveals that Donna Searer, who taught both children in preschool, testified that both children performed well in their math and reading exercises. Searer noted that Wh.D. was very shy when she first arrived in preschool but by the time she finished had become very talkative. Jill Shock, who is Wh.D.'s first grade teacher, testified that Wh.D. is "very bright" and academically "very sound," noting that "she's above her peers and so she was reading books in 3rd, 4th, and 5th grade levels" and was "able to complete her work quickly so she was able to . . . advance more quickly than the other students." Transcript at 10. Shock testified that "[s]ocially, [Wh.D.] is a friend to everybody and well liked by everyone." Id. Shock testified that she was "very proud" of Wh.D. when she "tried out for the all school play" and "got a speaking part and [] did an awesome job." Id. Jody Boyer, whose husband is a Senior Pastor at the church Mother attends with the children, testified that the children enjoy the church activities and interact with the other children during such activities. Nancy Newcomer, who is Mother's mother, testified that Wh.D. has "transformed with relationships with other

22

children," that she has "opened up," and that the children are happy and healthy. Id. at 82-83.

To the extent that Father argues that Claudia Davis recommended that Wh.D. remain in counseling and that this contradicts Finding 19, we observe that Davis testified in her deposition that "[t]he situation with [Wh.D.] acting out . . . was remedied within a few months. . . . Mother followed through on my recommendations . . . . And [Wh.D.] loved that and responded very positively. And within . . . three, four months . . . [Wh.D.'s] behavior problems were pretty much eliminated." Appellant's Appendix at 382. Davis also testified that, when Wh.D.'s treatment was ended by both parents, Mother felt that treatment had finished and Father wanted therapy to stop because he believed that continuing therapy might harm her and would subject her to scrutiny.

Evidence, including the testimony of Wh.D.'s first grade teacher and the preschool teacher of both children, was presented to support the court's finding that the children have adjusted to the change in residence over the past couple of years. We cannot say that the court's finding in this regard is clearly erroneous.

Father also challenges Finding 20 of the Dissolution Decree which finds that both parents' mental health was in question but also that "there is nothing in the record which would suggest that either parent is a danger to the children or incapable of providing an appropriate upbringing." Id. at 30. Thus, it is unclear to what extent the court relied upon this finding in rendering its custody order. Moreover, even if we were to agree with Father that the evidence does not support either directly or by inference that his mental health is in question, we do not believe that this would require reversal in this instance

23

due to the court's caveat that Mother's mental health does not suggest that she is incapable of providing an appropriate upbringing.

Based upon the evidence in the record and the court's findings, we conclude that the court's custody determination that Mother be awarded primary physical custody, that Father be awarded certain parenting time, and that the parents share legal custody, was not clearly erroneous. See Owensby v. Lepper, 666 N.E.2d 1251, 1257 (Ind. Ct. App. 1996) (holding that the court's findings were sufficient to support its custody decision), reh'g denied.

II.

The next issue is whether the court's child support calculation was clearly erroneous. A trial court's calculation of a child support obligation is presumptively valid and will be reversed only if it is clearly erroneous or contrary to law. Young v. Young, 891 N.E.2d 1045, 1047 (Ind. 2008). Again, "[a] decision is clearly erroneous if it is clearly against the logic and effect of the facts and circumstances before the trial court." Id. In conducting our review, we will not reweigh the evidence and will consider only the evidence most favorable to the judgment. Saalfrank v. Saalfrank, 899 N.E.2d 671, 674 (Ind. Ct. App. 2008).

Father argues that the court abused its discretion when it: (A) calculated Father's parenting time credit at ninety-eight overnights; and (B) failed to account for Mother's bonus income in its final child support calculation. We address each of Father's arguments separately.[6]

---

[6] We note that Mother argues in her brief that the issue of support is "moot" because the parties

24

A.    Parenting Time Credit

As noted above, the court in its Dissolution Decree stated that Father was responsible for $319 per week in child support, and this figure was modified to $288 per week after an Agreed Modification Order because the CSOW erroneously included $40 per week for child care expenses. Both the original CSOW and the modified CSOW gave Father credit for ninety-eight overnights, which equated to a weekly credit of $58.89.

We may not reverse a parenting time credit determination unless the trial court manifestly abuses its discretion. Vandenburgh v. Vandenburgh, 916 N.E.2d 723, 727 (Ind. Ct. App. 2009). "No abuse of discretion occurs if there is a rational basis in the

entered into the Agreed Modification Order and agreed that Father's support obligation should be $288 per week and adopted the CSOW which noted that ninety-eight overnights would be used to determine Father's parenting time credit. Appellee's Brief at 20. Mother argues that this agreement is binding and resolves any issues relating to support. Father responds in his reply brief that following the entry of the Dissolution Decree, there were certain errors that the parties wanted to correct as soon as possible including financial accounts awarded to Father and the court's child support calculations related to daycare expenses which were not being incurred. Father argues that "[r]ather than allow[ing] this error to continue and accrue, counsel for the parties agreed to make those corrections by way of an Agreed Order" and this "did not waive Father's right to request a correction of or appeal other matters he believed to be in error." Appellant's Reply Brief at 9.

Mother does not cite to authority for the proposition that where the parties to a decree of dissolution file an agreed modification order to correct certain, limited aspects of the order, the parties forego or waive any right to challenge other aspects of the decree on appeal. The Agreed Modification Order did not address the issues Father raises on appeal, namely, that his parenting time credit was incorrectly calculated and that the court should have included Mother's bonus income in calculating what percentage of Father's bonus income he should pay in child support. We agree with Father that the Agreed Modification Order did not deprive him of his right to appeal the court's child support order in the Dissolution Decree. Cf. Beaman v. Beaman, 844 N.E.2d 525, 533 (Ind. Ct. App. 2006) (noting that wife's argument that husband "invited any claimed error with respect to the settlement agreement by signing it and submitting [it] to the court as part of the legal separation action" was erroneous because "[a]cceptance of such an argument essentially would preclude any party to a contract from later claiming it was invalid, vague, or ambiguous in any respect" and, additionally, that husband "never acquiesced in the trial court adopting the settlement agreement wholesale as part of the final dissolution decree").

25

record supporting the trial court's determination." Saalfrank, 899 N.E.2d at 681 (citation and quotation marks omitted).

Father argues that since the Agreed Order on January 31, 2011, which resolved the issue of his ability to have the children overnight on Tuesdays, he has consistently had the children overnight and "has never missed any parenting time in three years," and Mother acknowledged that Father exercises his midweek overnight parenting time. Appellant's Brief at 32. Thus, Father contends, the evidence was undisputed that he exercised all of his parenting time under the guidelines, or ninety-eight overnights, plus an additional thirty-six overnights for the regular midweek parenting time (after adjusting for summer break, spring break, thanksgiving, and winter break, or fourteen weeks), and that his "actual overnight parenting time with the children each year amounts to approximately 134 overnights." Id. at 33. Father also notes that Mother submitted a CSOW proposing that Father be credited for 118 overnights,[7] and Father proposed a parenting time credit of 182 overnights which is consistent with a 50/50 parenting time split.

Mother argues that the commentary to Ind. Child Support Guideline 6 "provides that if general parenting time is exercised the number of overnights should be 98." Appellee's Brief at 19. Mother argues that the court indicated that Father's "weekday parenting time could be an overnight at his discretion" and that "98 overnights would be used no matter whether [he] exercised overnight parenting time or not." Id. at 19-20.

---

[7] Father notes in his brief that it is unclear how Mother arrived at 118 overnights.

26

Mother argues that the court indicated as such "because of the permissive and speculative nature of this provision . . . ." Id. at 20.

Father argues in his reply brief that "ALL parenting time is 'permissive' and discretionary," and "parenting time credit is based upon the parenting time actually exercised or expected to be exercised." Appellant's Reply Brief at 9-10. Father argues that there is no dispute that he exercises all of his parenting time that Mother allows. Father argues that here "the Court did, in fact, deviate from the parenting time actually exercised by and awarded to Father, and the Court did not state or provide a written explanation for doing so as required" by the Child Support Guidelines. Id. at 10.

Ind. Child Support Guideline 6 provides that "[a] credit should be awarded for the number of overnights each year that the child(ren) spend with the noncustodial parent." See also Sandlin v. Sandlin, 972 N.E.2d 371, 377 (Ind. Ct. App. 2012) ("Under Child Support Guideline 6, a non-custodial parent is afforded 'credit' to his or her child support obligation for hosting his or her children overnight. The credit is based upon the number of overnights a child or children spends with the non-custodial parent.") (citing Grant v. Hager, 868 N.E.2d 801, 802 (Ind. 2007)). "If the court determines it is necessary to deviate from the parenting time credit, it shall state its reasons in the order." Sandlin, 972 N.E.2d at 377 (quoting Ind. Child Support Guideline 6, Commentary).

The Commentary to the Child Support Guideline 6 provides, "The computation of the parenting time credit will require a determination of the annual number of overnights of parenting time exercised by the parent who is to pay child support, the use of the standard Child Support Obligation Worksheet, a Parenting Time Table, and a Parenting

Time Credit Worksheet." The Commentary also states that "[a]s parenting time increases, a proportionally larger increase in the credit will occur." Ind. Child Support Guideline 6, Commentary. Also, "[t]he computation of the parenting time credit will require a determination of the annual number of overnights of parenting time exercised by the parent who is to pay child support, the use of the standard Child Support Obligation Worksheet, a Parenting Time Table, and a Parenting Time Credit Worksheet." Id. Importantly, the Commentary specifically instructs that "[i]f the parents are using the Parenting Time Guidelines *without extending the weeknight period into an overnight*, the noncustodial parent will be exercising approximately 98 overnights." Id. (emphasis added).

Here, the court awarded Father parenting time on Tuesday evenings, and it extended this parenting time to include having the children overnight. As Father notes, he is diligent about exercising his parenting time and having the children overnight, and Mother does not dispute this fact. Parenting time credit is based upon the number of nights the children spend with the non-custodial parent. In this instance, the court did not award parenting time credit which accurately reflects the number of overnights the children spend at Father's residence as reflected by the record. Accordingly, we conclude that the court's parenting time credit award was clearly erroneous, and we remand for further proceedings to amend the CSOW and support order to reflect the number of annual overnights the children spend with Father.

28

B.     Mother's Bonus Income

Father argues that Mother indicated at trial that she receives annual bonus income, and she proposed that "for purposes of calculating child support on bonus income, Father pay 14% of his bonus income less 14% of her bonus income." Appellant's Brief at 34. Father argues that the court at trial "appeared to acknowledge [that] Mother's bonus should be included," but it failed to do so in the Dissolution Decree. Id. Father notes that Mother's proposed decree did not mention her bonus income, and he "can only assume it was the Trial Court's adoption of the majority of Mother's proposed Decree that led to the error . . . ." Id. at 35. Father also argues that the court erred in calculating the percentage of his bonus pay which should be paid in child support, noting that the court explained that in order to calculate the percentage, it divided Father's child support obligation of $319, found on Line 8, by his gross income of $2,319.77, listed on Line 1, and Father notes that the correct percentage based upon that calculation is 13.7% rather than 15% as listed by the court in its CSOW. Father also notes that the parties subsequently filed and the court entered an Agreed Modification Order based upon the fact that the court factored in daycare expenses which did not exist and which reduced his weekly obligation to $288, that if the court's formula were applied to the Child Support Obligation Worksheet following the Agreed Order the percentage of his bonus pay would be 12.4%, and that this would still be incorrect because it does not factor in Mother's bonus pay or the correct amount of parenting time credit of approximately 134 overnights.

29

Mother argues that the commentary to Ind. Child Support Guideline 3A states that "[o]ne method of treating irregular income is to determine the ratio of the basic child support obligation (line 4 of the worksheet) to the combined weekly adjusted income (line 3 of the worksheet)" and that this calculation would yield a percentage of 15.2% of Father's gross irregular income rather than the 14% ordered by the court. Appellee's Brief at 20 (quoting Ind. Child Support Guideline 3A, Commentary). Mother argues that the court did not commit error when it omitted her "de minimus $975.00 per year bonus income from these calculations." Id.

Ind. Child Support Guideline 3A addresses the definition of weekly gross income for the purposes of Line 1 of a CSOW and notes that "[w]eekly gross income of each parent includes income from any source, except as excluded below, and includes, but is not limited to, income from salaries, wages, commissions, *bonuses* . . . ." (Emphasis added). Each parent has an income amount entered on Line 1. The Commentary to Guideline 3A provides further explanation as follows:

> **2. Determination of Weekly Gross Income.** Weekly Gross Income is the starting point in determining the child support obligation, and it must be calculated for both parents. . . .
>
> The Child Support Obligation Worksheet does not include space to calculate Weekly Gross Income. It must be calculated separately and the result entered on the worksheet.
>
> In calculating Weekly Gross Income, it is helpful to begin with total income from all sources. This figure may not be the same as gross income for tax purposes. . . .
>
> * * * * *
>
> **b. Overtime, Commissions, Bonuses and Other Forms of Irregular Income.** There are numerous forms of income that are irregular

30

or nonguaranteed, which cause difficulty in accurately determining the gross income of a party. Overtime, commissions, bonuses, periodic partnership distributions, voluntary extra work and extra hours worked by a professional are all illustrations, but far from an all-inclusive list, of such items. Each is includable in the total income approach taken by the Guidelines, but each is also very fact sensitive.

. . . . Care should be taken to set support based on dependable income, while at the same time providing children with the support to which they are entitled.

*When the court determines that it is not appropriate to include irregular income in the determination of the child support obligation, the court should express its reasons. . . .*

\* \* \* \* \*

Judges and practitioners should be innovative in finding ways to include income that would have benefited the family had it remained intact, but be receptive to deviations where reasons justify them. *The foregoing discussion should not be interpreted to exclude consideration of irregular income of the custodial parent*.

(Emphases added).[8]

---

[8] The Commentary to Ind. Child Support Guideline 3A also provides the following instruction of how irregular income may be included in a child support calculation:

. . . . When the court determines that it is appropriate to include irregular income, an equitable method of treating such income may be to require the obligor to pay a fixed percentage of overtime, bonuses, etc., in child support on a periodic but predetermined basis (weekly, bi‑weekly, monthly, quarterly) rather than by the process of determining the average of the irregular income by past history and including it in the obligor's gross income calculation.

One method of treating irregular income is to determine the ratio of the basic child support obligation (line 4 of the worksheet) to the combined weekly adjusted income (line 3 of the worksheet) and apply this ratio to the irregular income during a fixed period. For example, if the basic obligation was $110.00 and the combined income was $650.00, the ratio would be .169 ($110.00 / $650.00). The order of the court would then require the obligor to make a lump sum payment of .169 of the obligor's irregular income received during the fixed period.

The use of this ratio will not result in an exact calculation of support paid on a weekly basis. It will result in an overstatement of the additional support due, and particularly so when average irregular income exceeds $250.00 per week or exceeds 75%

Here, it is undisputed that Mother received bonus income. Indeed, at trial Mother indicated on direct examination that she was requesting that Father "be required to pay [her] 15% of his annual bonus minus 15% of [her] extra income." Transcript at 96. Mother's counsel then specifically asked, "[a]nd you acknowledge that your bonus should be tacked in there as well, is that correct," and Mother responded: "Absolutely, that would only be fair." Id. at 97. As Father highlights, the court appeared to accept that Mother did receive bonus income, noting that "[w]ell I assume the award would be, how to treat, if it's an award it's, if it's compensation over and above her salary then it, it's, it would be, I guess bonus income, just like his . . . ." Id. at 275. The court did not explain in its Dissolution Decree, however, why it did not account for Mother's bonus income on its CSOW to determine Father's final child support obligation. Based upon the evidence and the Commentary to the Ind. Child Support Guidelines, we conclude that the court clearly erred in failing to address Mother's bonus income, and we remand with instructions that the court account for such income.[9]

### III.

The final issue is whether the court abused its discretion in appointing, as amended in its June 1, 2012 Order, a Parenting Time Coordinator. In Finding 22 of the Dissolution Decree, the court found that "[t]he parties, and the children, would benefit from the appointment of a Level IV parenting time coordinator. Tara Porter is appointed as the

---

of the regular adjusted Weekly Gross Income. In these latter cases the obligor may seek to have the irregular income calculation redetermined by the court.

[9] We need not address the parties' arguments regarding percentages of bonus pay owed because the trial court on remand will address such arguments after calculating Father's correct parenting time credit.

coordinator. [Mother] shall pay 23% and [Father] shall pay 77% of Ms. Porter's fees." Appellant's Appendix at 31. On February 17, 2012, in Father's motion to correct errors, Father stated that Finding 22 "is an error in that there is no such thing as a 'parenting time coordinator,' rather there are Parenting Coordinators. Further, there is no such thing as Level IV services for Parenting Coordinators. There are only levels I, II and III." Id. at 117. In the June 1, 2012 order on Fathers' motion to correct errors, the court amended Finding 22 to read: "The parties and the children would benefit from the appointment of a Parenting Time Coordinator. Tara Porter is appointed as the coordinator. [Mother] shall pay 23% and [Father] shall pay 77% of the uninsured portion of the coordinator's fees." Id. at 26.

On appeal, Father argues that "[t]he Trial Court's Order on Motion to Correct Errors eliminated the Level IV authority for the Parenting Coordinator, but did not determine a proper level of authority or issue a separate order concerning the appointment of the Parenting Coordinator to give effect to it's [sic] order." Appellant's Brief at 37. Father notes that, as a result, "the parties and the minor children have been without the benefit of a Parenting Coordinator." Id. Mother states in her brief that she "agrees that the Trial Court should issue a separate order appointing a parenting time coordinator and giving this coordinator Level III authority. [She] has indicated to [Father] her willingness to enter into an agreed order in this regard and remains ready to do so." Appellee's Brief at 21.

We observe that generally in Indiana the use of and level of authority acceded to a parenting coordinator is determined based upon an agreement of the parties. See Gomez

33

v. Gomez, 887 N.E.2d 977, 979 (Ind. Ct. App. 2008) (noting that the mother and father "agreed to submit to mediation and have a parenting time coordinator appointed to make a parenting time recommendation due to their inability to work together cooperatively"); Bacon v. Bacon, 877 N.E.2d 801, 802-803 (Ind. Ct. App. 2007) (noting that a parenting coordinator was appointed as part of the decree of dissolution and the court subsequently "requested that the parties submit a stipulation specifying the parenting coordinator's duties within thirty days"), reh'g denied, trans. denied.[10]  Recognizing that both parties agree that a parenting coordinator would be in the best interests of Wh.D. and We.D., and observing that Mother stipulates that she agrees to a parenting coordinator with Level III authority, we remand for the court to issue a separate order appointing a parenting coordinator which specifies the parenting coordinator's level of authority.[11]

---

[10] We note that this court has previously held that even in instances where neither party requested or agreed to the appointment of a parenting coordinator, based upon the spirit and intent of the Indiana Parenting Time Guidelines, trial courts may appoint a parenting coordinator in situations where the parents experience ongoing communication difficulties in making decisions for the best interest of the children.  See In re Paternity of C.H., 936 N.E.2d 1270, 1274 (Ind. Ct. App. 2010) (holding that the trial court did not err in appointing the parenting coordinator), reh'g denied, trans. denied.

We observe that the Indiana Courts website contains a draft version of the Indiana Parenting Time Guidelines ("Draft Guidelines"), dated January 2012, which includes an amended Section IV, titled "Parenting Coordination," and which contains subsections A-I detailing proposed qualifications, terms of service, and the role and authority of a parenting coordinator, as well as detailing circumstances in which a court should appoint a parenting coordinator over the objection of the parties, among other things.  See Indiana Rules of Court, *Draft Indiana Parenting Time Guidelines* (Jan. 2012), http://www.in.gov/judiciary/files/rules-prop-ptg-2012.pdf.  Appendix A of the Draft Guidelines also contains a model order for appointing a parenting coordinator.  See Indiana Rules of Court, *Draft Indiana Parenting Time Guidelines*, Appendix A (Jan. 2012), http://www.in.gov/judiciary/files/rules-prop-ptg-2012-appendixa.pdf.  On January 4, 2013, the Indiana Supreme Court issued an Amended Order Amending Indiana Parenting Time Guidelines which did not include the draft section on parenting coordination.  See Amended Order Amending Indiana Parenting Time Guidelines, No. 94S00-1205-MS-275 (Ind. Jan 4, 2013), http://www.in.gov/judiciary/files/order-rules-2013-0107-parenting.pdf.

[11] Finally, to the extent that Father requests that the trial court designate a level of authority for the parenting coordinator and that Mother stipulates that Level III authority would be appropriate, we observe that the Families Moving Forward, Inc., "an interdisciplinary organization of attorneys, mental health providers, accountants, and other professionals committed to improving the process of family

34

CONCLUSION

For the foregoing reasons, we affirm the court's custody order, reverse the court's order on support and regarding a parenting coordinator, and remand for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

BAILEY, J., and VAIDIK, J., concur.

---

transition in Indiana," by their Parenting Coordination Committee, has prepared a report titled "Indiana Parenting Coordination Guide" which states the following:

> **Roles of the Parenting Coordinator:**
>
> There are three primary roles the Court may order for the parenting coordinator. For ease of reference, these roles will be designated Level 1, Level 2, and Level 3.
>
> **Level 1**: In Level 1, the parenting coordinator is not empowered to resolve impasses between the parents by means of a "binding" recommendation. . . .
>
> * * * * *
>
> **Level 2**: At this level, the PC's role includes everything in Level 1, plus a certain measure of decision-making authority to resolve impasses by means of a "binding" recommendation. . . .
>
> * * * * *
>
> **Level 3**: Here the PC's role and authority includes everything in Level 2, plus the PC may, as specified by the Court order, select and manage a treatment team to attend to the needs of the parents and the children. This involves the selection of medical and/or mental health professionals to provide necessary treatment services. . . .

Families Moving Forward, Inc., *Indiana Parenting Coordination Guide*, at 3-5 (2005), http://indianapsychology.org/pdf/parent_coordination_guide_2005.pdf (internal citation omitted).