## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 05 2016, 8:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bryan L. Ciyou
Darlene R. Seymour
Ciyou & Dixon, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Cynthia A. Marcus
John J. Uskert
Marcus Law Firm, LLC
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Theodore William Kieffer, <br> *Appellant-Respondent* <br><br> v. <br><br> Jennifer Trockman, <br> *Appellee-Petitioner* | May 5, 2016 <br><br> Court of Appeals Case No. 29A02-1509-JP-1499 <br><br> Appeal from the Hamilton Superior Court <br><br> The Honorable Daniel J. Pfleging, Judge <br><br> Trial Court Cause No. 29D02-1403-JP-304 |

**Crone, Judge.**

## Case Summary

[1]     Theodore Kieffer ("Father") and Jennifer Trockman ("Mother") are the

biological parents of A.T.  Father and Mother filed cross-petitions to establish

paternity, custody, parenting time, and support. During the proceedings, Mother obtained an ex parte protective order against Father and asked that it be extended. After a hearing, the trial court issued an order establishing Father's paternity; granting Mother sole custody of A.T., with Father to receive parenting time pursuant to the Indiana Parenting Time Guidelines ("the Guidelines"); ordering Father to pay child support, most of Mother's attorney's fees, and all of the costs for a parenting coordinator and a custody evaluation; and extending Mother's protective order for two years.

[2] On appeal, Father contends that the trial court erred in ordering him to pay the aforementioned attorney's fees and costs; in calculating his child support obligation; and in extending the protective order. Finding no reversible error, we affirm.

## Facts and Procedural History

[3] Mother gave birth to A.T. in September 2013, and the parties executed a paternity affidavit the next day. The parties initially agreed to joint custody, but because they failed to submit genetic test results to a local health officer within sixty days of A.T.'s birth, Mother obtained sole custody pursuant to Indiana Code Section 16-37-2-2.1(h)(5). Mother has been A.T.'s primary caretaker since birth. Father had limited contact with A.T. during her first several months, but he later exercised regular parenting time pursuant to the Guidelines. Father videotaped the parenting time exchanges and also videotaped A.T.'s medical appointments. Mother resides with her mother and

works from home as a medical recruiter. Father is a medical doctor in a postgraduate fellowship program.

[4] In March 2014, Mother filed a petition to establish paternity, custody, parenting time, and support. In April 2014, Father filed a cross-petition seeking joint custody. In August 2014, Mother filed a petition for a protective order against Father based on incidents that occurred in February and August 2014; the petition was denied without a hearing. In December 2014, Mother filed a second petition for a protective order based on the same two incidents as well as several subsequent incidents; a protective order was issued ex parte, and the matter was consolidated with the paternity proceeding. Over Mother's objection, Father filed a petition for a custody evaluation, which was performed by Dr. John Ehrmann.

[5] A final hearing was held in July 2015. In August 2015, the trial court issued an order containing the following relevant findings and conclusions:

> 12. Pursuant to Father's motion, the Court ordered a custody evaluation be performed by Dr. Ehrmann.
>
> 13. Dr. Ehrmann testified that both parents exhibited some degree of distrust towards each other. He also testified that, while Mother was without significant psychopathology, Father was impulsive, self-indulgent, manipulative, somewhat immature, and prone to behave in aggressive and hostile ways.
>
> 14. Dr. Ehrmann reviewed hours of Father's recordings of parenting exchanges. He testified that [Mother] appeared to be attempting to be both reasonable and pleasant throughout the

video. Father was often angry, nasty and treated [M]other with contempt. After watching the videos, Dr. Ehrmann concluded that it was not difficult to understand why Mother feels threatened and intimidated by Father.

15. Dr. Ehrmann concluded that [A.T.] appears to be a fairly happy, healthy, normally developing child. She exhibited emotional bonding and attachment to both of her parents. She also evidenced a bond with [Mother's older daughter by her ex-husband] and her maternal grandmother.

16. Dr. Ehrmann testified that there was a great deal of conflict between these parents that is likely to continue.

17. Dr. Ehrmann testified that Father videotapes the child's medical appointments because he has a hard time trusting doctors. He also testified that Father claimed that Mother had not consulted with him regarding the child having ear tubes inserted. Father later acknowledged an inconsistency in that claim – not only had [M]other consulted with him, she had taken the child to the physician that Father had recommended. Father had even attended that appointment.

18. At the appointment, Father's behavior was so outrageous that the attending doctor removed the child from the examining room. The physician's office staff then called security after Father repeatedly threatened Mother. Mother was in tears when she left the appointment with the minor child. Dr. Ehrmann indicated that as a result of Father's concerns, Mother sought a second opinion from an ENT specialist recommended by the child's pediatrician. Both physicians recommended ear tubes. Dr. Ehrmann also testified that the text messages between the parties regarding medical issues showed extensive conflict. Mother wanted to follow the recommendations of the child's healthcare provider. Father often refused to talk to the healthcare provider and then opposed each provider's recommendations. Dr. Ehrmann indicated that Father's

positions regarding the child appeared to be more about "retaliation" against Mother th[a]n the welfare of the child.

19. Dr. Ehrmann recommended that [M]other should have sole custody of the minor child.

20. The high-conflict relationship between the parents was further evidenced by the hundreds of pages of text messages between the parties where Father was insulting, demeaning, and debasing.

21. Father entered Mother's home without an invitation in the early hours of the morning after drinking alcohol and was threatening. Mother and her family were terrified to find him in the house.

22. At another time, following repeated demeaning and intimidating communications, Father came to the house when he specifically knew that he had been asked not to come.

23. After consideration of all relevant factors, including those set forth in Ind. Code § 31-17-2-8, the Court finds that joint custody is not in the minor child's best interest. Mother shall have sole custody of the minor child.

…

24. The Indiana Parenting Time Guidelines ("IPTG") provide that there is a presumption that the guidelines are applicable in all cases. Father shall have parenting time pursuant to the IPTG, with the age of the child taken into consideration.

25. Father has exercised regular parenting time over the last year. However, as provided for by the IPTG, the parenting time has not included overnights because Father had limited contact with the child during the first months of her life. The Court is concerned over the anger and impulsivity demonstrated by

Father. Father is ordered to attend counseling with Dr. William Steele, who is familiar with working in the context of high-conflict parenting.

26. After the parents have met with the Parenting Coordinator … at least once, and after Father has met with Dr. Steele at least once, overnights may be instituted on a "trial-run" basis. The Parenting Coordinator would determine whether the trial-runs were successful or needed to be reintroduced at a later time.

…

27. Dr. Ehrmann recommended that Jonni L. Gonso, Ph.D. be appointed as a level 3 Parenting Coordinator because of the high-conflict nature of the relationship between [Mother] and [Father]. Father does not oppose the appointment of a Parenting Coordinator; however, he proposes a level 2 Coordinator and does not agree on the appointment of Jonni Gonso, Ph.D. Father named a panel of three (3) potential parenting coordinators.

28. Mother has attempted to communicate with Father in a respectful and courteous manner. Mother has attempted to keep Father abreast of all medical issues, as well as the child's developmental progress.

29. Father has repeatedly communicated with Mother in a contemptuous, debasing and angry manner. He has disrespected her and called her names. He has exhibited this behavior verbally in front of the child.

30. Father is a medical doctor who has completed his residency in medicine and has decided to take an additional two years in a fellowship. Mother makes about $37,555/year as a medical recruiter.

31. The [C]ourt appoints Jonni L. Gonso, Ph[.]D. as a Level 3

Parenting Coordinator.

32.  After considering the behavior[1] of the two parties and the earning ability of the two parties, the Court allocates the cost of the Parenting Coordinator to Father.

…

33.  Initially, all communication regarding the child shall be written in a spiral bound notebook, which will be passed back and forth between the parents at parenting time exchanges in a bag with the child's clothing.  Only matters directly relating to the child should be put in the notebook.  Urgent matters such as medical emergencies or delays in parenting time exchange should be texted.  Any change to this paragraph of the Order shall be at the discretion of the Parenting Coordinator.

34.  There will be no negative communication, verbal or otherwise, at the parenting time exchanges.  There shall be no name calling, no denigrating or debasing language, and no curse words.

…

35.  Parenting time exchanges shall take place at the Fishers Police Department unless the parties are able to agree otherwise. There will be no cameras, video or audio recordings at exchanges.

….

37.  Child support shall be pursuant to the Indiana Child Support

---

[1] In a footnote, the trial court stated, "This behavior makes the appointment of a Parenting Coordinator necessary."  Appellant's App. at 12 n.3.

Guidelines.  The Court attaches its child support obligation worksheet (CSOW) as its own "Exhibit 1."  The Court finds that Mother has one prior born child for whom there is no child support order, but whom Mother has a legal duty to support.  Following review of [Mother's] financial declaration, the court finds that $95/week is a reasonable sum to attribute to that duty.

38.  The [C]ourt finds that there is no cost to Father for the child's health insurance.  The Court further finds that the cost to Mother to provide health insurance for the minor child is $7.00/week.  The [C]ourt orders Father to maintain health insurance on the child.  Mother may continue to provide health insurance, but she is not receiving credit for it on the CSOW.

39.  Father shall pay child support to Mother by Income Withholding Order through the INSCCU in the amount of $308.10 per week, commencing September 4, 2015.

….

42.  Ind. Code § 31-14-18-2 provides that the Court may order a party to pay (1) a reasonable amount for the cost to the other party of maintaining an action for paternity, and (2) a reasonable amount for attorney's fees, including amounts for legal services provided and costs incurred, before the commencement of the proceedings or after entry of judgment.

43.  Mother has incurred attorney fees of $33,221.16.  This includes a witness fee to Dr. Ehrmann of $1,800.00.  In addition, Mother has incurred the costs of preparation of the Findings of Fact and Conclusions of Law.  Father has incurred attorney fees of $26,930.19.  The Court finds that [F]ather's behavior during the pendency of these proceedings has necessitated the filing of the protective order as well as greatly increasing the costs of these proceedings.  After a consideration of all the evidence, as well as the ability of the parties to pay the fees, the Court orders that Father pay $30,000 of [M]other's attorney fees within ninety (90)

days.  Father shall pay the fees directly to [Mother's counsel].  See Ind. Code § 31-14-18-2(b) ("[t]he court may order the amount to be paid directly to the attorney, who may enforce the order in the attorney's name").

…

44.  Father requested that a custody evaluation be performed by Dr. Ehrmann.  Mother objected to the custody evaluation because she did not have adequate funds to pay for such an evaluation.  The court orders that Father shall be responsible for the cost of the custody evaluation in the amount of $6,984.00[.]

…

[45].  Ind. Code § 31-14-16-1 provides that protective orders may be issued in a paternity action.

….

[51].  The protective order … will remain in place for two (2) years.  That Order will be modified to allow for communication regarding the child to take place (as noted above).

[52].  The Parenting Coordinator may make recommendations relating to the need for the protective order to be modified.

Appellant's App. at 8-15.  Father now appeals.  Additional facts will be provided below.

# Discussion and Decision

## Section 1 – The trial court did not abuse its discretion in ordering Father to pay most of Mother's attorney's fees plus the costs of the parenting coordinator and custody evaluation.

[6] "Indiana follows the 'American rule,' under which each party is ordinarily responsible for paying his or her own legal fees in the absence of a fee-shifting statutory or contractual provision." *H & G Ortho, Inc. v. Neodontics, Int'l, Inc.*, 823 N.E.2d 734, 737 (Ind. Ct. App. 2005). Pursuant to Indiana Code Section 31-14-18-2, a court in a paternity action may order a party to pay "(1) a reasonable amount for the cost to the other party of maintaining an action under this article; and (2) a reasonable amount for attorney's fees, including amounts for legal services provided and costs incurred, before the commencement of the proceedings or after entry of judgment." "In making such an award, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such factors that bear on the reasonableness of the award." *In re Paternity of M.R.A.*, 41 N.E.3d 287, 296 (Ind. Ct. App. 2015) (citation and quotation marks omitted). "The trial court may also consider any misconduct by one party that causes the other party to directly incur additional fees. When one party is in a superior position to pay fees over the other party, an award of attorney fees is proper." *Id.* (citations and quotation marks omitted). "We review a trial court's award of attorney's fees for an abuse of discretion." *Id.* "An abuse of discretion occurs when a trial court's decision is against the logic and effect of the facts and circumstances

before the court or if the court has misinterpreted the law." *Mitten v. Mitten*, 44 N.E.3d 695, 699 (Ind. Ct. App. 2015).

[7] To the extent that Father challenges the trial court's findings and conclusions on this and other issues, we will set them aside only if they are clearly erroneous, i.e., when the record contains no facts or inferences to support them. *In re Riddle*, 946 N.E.2d 61, 66 (Ind. Ct. App. 2011). "To determine that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made." *Campbell v. Campbell*, 993 N.E.2d 205, 209 (Ind. Ct. App. 2013), *trans. denied*. "We must defer to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence, and we must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment." *Crider v. Crider*, 15 N.E.3d 1042, 1053 (Ind. Ct. App. 2014), *trans. denied*. "It is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Campbell*, 993 N.E.2d at 209. We apply a de novo standard of review to legal conclusions. *Riddle*, 946 N.E.2d at 66.

[8] Father first argues that the trial court's findings do not support its conclusion that he has the ability to pay $30,000 of Mother's attorney's fees plus the nearly $27,000 in fees that he has incurred. He claims that the evidence shows that he "is already over $300,000 in debt and cannot pay his bills." Appellant's Br. at 10. The record indicates that over $278,000 of that debt consists of medical

school loans, which are currently in forbearance and will not have to be repaid in one lump sum. Father presented no evidence about when he must start repaying the loans or how much the payments will be. Also, Father disregards evidence that as of July 1, 2015, his gross annual salary increased over ten percent to $60,338, compared to approximately $37,555 for Mother. Petitioner's Ex. 8.[2] Mother's living expenses may be substantially lower than Father's, but so are her income and earning potential. Father testified that he was "paying for these proceedings with credit cards," Tr. at 434, but he presented no evidence that he was nearing his credit limit.[3] He also testified that he had set aside $3000 for A.T.'s college expenses, which is ten percent of his obligation to Mother's counsel. More significantly, Father does not challenge the trial court's finding that his obdurateness greatly increased the cost of the proceedings, i.e., that he has only himself to blame for a substantial portion of both parties' legal bills. In sum, we find no clear error or abuse of discretion regarding the trial court's order as to attorney's fees.

---

[2] Father claims that "when one considers [his] income versus the amount of expenses he pays each month, [he] actually has negative income, or cash flow." Appellant's Br. at 11 (citing Respondent's Exh. G, Father's verified financial declaration). According to this exhibit, Father's gross weekly income is $1044.32, reflecting a gross annual income of $54,304.64, and he has a negative weekly cash flow of $54.23 ($1044.32 - $142.76 in weekly health insurance premiums - $955.79 in other weekly expenses and deductions = -$54.23). Father's financial declaration does not account for the abovementioned salary increase, however. In its child support obligation worksheet, the trial court listed Father's gross weekly income as $1108, reflecting a gross annual income of $57,616, which closely approximates six months of Father's former salary plus six months of his current salary ($27,152.32 + $30,169.00 = $57,321.32). Appellant's App. at 16.

[3] Father states that "there is overwhelming evidence in the Record to show" that he "has no property or liquid assets to satisfy the trial court's judgment." Appellant's Br. at 11. Father cites no authority for the proposition that a judgment must be satisfied with property or liquid assets.

For largely the same reasons, we find no merit in Father's argument that the trial court abused its discretion in ordering him to pay the costs of the parenting coordinator and custody evaluation. It was Father's misconduct that necessitated the appointment of the parenting coordinator, and it was Father who requested a custody evaluation (which substantiated his misconduct) over Mother's objection that she could not afford it.

## Section 2 – The trial court did not abuse its discretion in calculating Father's child support obligation.

Next, Father contends that the trial court improperly calculated his child support obligation. "A trial court's calculation of child support is presumptively valid. We review decisions regarding child support for an abuse of discretion." *Mitten*, 44 N.E.3d at 699 (citation omitted).

Father first complains about the trial court's decision to credit Mother $265 for work-related child care expenses instead of granting his request to use pretax dollars through an employer-sponsored program to pay for A.T.'s daycare. He argues that if the trial court had granted his request, "he would be able to take advantage of a program that would free up money to help him pay off his debt and save money for the parties' child. This is congruous with maintaining the parties' and the child's lifestyle versus wasting pre-tax benefits." Appellant's Br. at 14-15 (citations to record omitted). The trial court was not obligated to maximize Father's pretax benefits.

[12] Father also takes issue with the trial court's decision to credit Mother $95 in support for her prior-born child, since no support order for that child exists. Father observes that "Mother testified that she agreed with her ex-husband that he would not be required to pay child support if she could have custody of her older daughter." *Id.* at 15 (citing Tr. at 365). Father claims that "[t]his is wholly inconsistent with the policy of child support and prohibited by law" and that he "cannot be held to pay a higher amount of support simply because Mother made an agreement with her ex-husband, a non-party, such that she would relieve him of his duty to support his child. This effectively shifted part of the burden to Father in this case." *Id.*

[13] Father fails to acknowledge, however, that "parents have a common law duty to support their children." *Carpenter v. Carpenter*, 891 N.E.2d 587, 593 (Ind. Ct. App. 2008). Thus, regardless of the legality of Mother's agreement with her ex-husband, the duty to support her prior-born child remains. Moreover, Indiana Child Support Guideline 3C specifically states,

> Where a party has a legal support duty for the child(ren) born prior to the child(ren) for whom support is being established, not by court order, an amount reasonably necessary for such support actually paid, or funds actually expended *shall* be deducted from weekly gross income to arrive at weekly adjusted income.

(Emphasis added.) Father does not challenge the reasonableness of the $95 credit, nor has he established that the credit resulted in anything other than a de

minimis increase in his support obligation.[4]  And it is well settled that de

minimis non curat lex ("the law does not redress trifles").  *D & M Healthcare,*

*Inc. v. Kernan*, 800 N.E.2d 898, 901 (Ind. 2003).  There was no abuse of

discretion here.

## Section 3 – The trial court did not err in extending Mother's protective order.

[14]    Finally, Father raises several objections to the trial court's extension of

Mother's protective order.  First, he argues that the order must be reversed

based on the doctrine of res judicata because Mother's second petition for a

protective order, which was granted, was duplicative of her first petition, which

was denied.  We disagree.  Res judicata, which "serves to prevent repetitious

litigation of disputes that are essentially the same," applies only when "the

former judgment was rendered on the merits," among other things.  *Helms v.*

*Rudicel*, 986 N.E.2d 302, 308 (Ind. Ct. App. 2013), *trans. denied*.  A judgment on

the merits is one "delivered after the court has heard and evaluated the evidence

and the parties' substantive arguments."  BLACK'S LAW DICTIONARY (10th ed.

2014).  Mother's first petition was denied without a hearing, and therefore res

judicata is inapplicable.[5]

---

[4] Under the Guidelines, reduction of the credit would not result in a dollar-for-dollar reduction of Father's support obligation.

[5] Also, Mother's second petition contained allegations about incidents that occurred after the incidents mentioned in the first petition, so res judicata would be inapplicable to those allegations in any event.

Second, Father argues that "Mother did not meet the legal standard required to obtain" a protective order. Appellant's Br. at 18. As we recently explained in *Fox v. Bonam*,

> Our legislature has indicated that the Indiana Civil Protection Order Act shall be construed to promote the protection and safety of all victims of domestic violence "in a fair, prompt, and effective manner" and the prevention of future domestic violence. Ind. Code § 34-26-5-1. Pursuant to Indiana Code Section 34-6-2-34.5, domestic violence includes stalking as defined by Indiana Code Section 35-45-10-1: "a knowing or an intentional course of conduct involving repeated or continuing harassment of another person that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." "The term does not include statutorily or constitutionally protected activity." *Id.* Indiana Code Section 35-45-10-2 defines harassment as "conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress." Impermissible contact "includes but is not limited to knowingly or intentionally following or pursuing the victim." Ind. Code § 35-45-10-3. "Harassment does not include statutorily or constitutionally protected activity[.]" Ind. Code § 35-45-10-2.
>
> A person who has been a victim of domestic violence may file a petition for a protective order against a person who has committed stalking against the petitioner. Ind. Code § 34-26-5-2(a). A finding that domestic violence has occurred sufficient to justify the issuance of a protective order "means that a respondent represents a credible threat to the safety of a petitioner or a member of the petitioner's household." Ind. Code § 34-26-5-9(f). Upon a showing of domestic violence "by a

preponderance of the evidence, the court shall grant relief necessary to bring about a cessation of the violence or the threat of violence." *Id*. A protective order is effective for two years after the date of issuance unless another date is ordered by the court. Ind. Code § 34-26-5-9(e).

45 N.E.3d 794, 798 (Ind. Ct. App. 2015) (footnote omitted).[6]

[16]   In its order, the trial court made the following relevant findings:

> [46].   The Court finds that Father entered [M]other's home without permission in the middle of the night, after drinking alcohol, and threatened and intimidated Mother.
>
> [47].   Father repeatedly threatened Mother without provocation in the doctor's office that caused the staff to become concerned enough about her well-being that they contacted security. Father acknowledges that he repeatedly told her that her days were numbered.
>
> [48].   Father repeatedly texted Mother, sometimes 30-40 times per day, in a debasing, threatening, and demeaning manner.
>
> [49].   Father repeatedly attempted to intimidate [M]other at parenting exchanges.
>
> [50].   Mother reasonably believes herself to be intimidated, harassed and threatened by Father.

---

[6] A court may issue a protective order ex parte if it appears from the petition that domestic or family violence has occurred, Ind. Code § 34-26-5-9(a), but a hearing on the petition must be set pursuant to Indiana Code Section 34-26-5-10.

Appellant's App. at 15.

[17]     Father argues that his communications with Mother "were related to disagreements over parenting styles, and would not cause a reasonable person to be terrorized, frightened, intimidated or threatened. Presumably if such were the standard, all parents would be entitled to protective orders at times during the minority of the children." Appellant's Br. at 19. The trial court's findings regarding the home invasion, altercation at the doctor's office, and threatening texts are amply supported by the record. Also, Mother testified that Father's anger toward her is "relentless" and "never stops"; that "[t]here was high conflict at every single [parenting] exchange" and that she "did not trust his demeanor" around A.T.; that he would follow her, videotape her, and "raise his voice" during the exchanges; and that "the whole presence around [Father] is very ugly and scary." Tr. at 219, 341, 369, 370. Dr. Ehrmann characterized Father as "angry" and "difficult to deal with" and as having a "desire to retaliate and punish [Mother]," which "is immature and not particularly in any way healthy and positively contributory to the entire situation." *Id*. at 68, 69.

Father's argument is essentially an invitation to reweigh evidence, draw inferences, and reassess witness credibility in his favor, which we may not do.[7]

[18] Father also argues that the protective order "violates [his] constitutional right to free speech and fundamental right to raise his child as he sees fit." Appellant's Br. at 20. We disagree. The constitution would not protect Father in intimidating, harassing, or threatening Mother while "voic[ing] his concerns with Mother over [A.T.'s] care." Appellant's Br. at 20. *See* IND. CONST. art. 1, § 9 ("No law shall be passed … restricting the right to speak, write, or print, freely, on any subject whatever: *but for the abuse of that right, every person shall be responsible.*") (emphasis added); *see also* Ind. Code § 35-45-2-1 (a person who communicates a threat to another person with the intent to place the other person in fear of retaliation for a prior lawful act commits class A misdemeanor intimidation). Father has failed to establish that the trial court erred in extending the protective order. Therefore, we affirm.

[19] Affirmed.

Najam, J., and Robb, J., concur.

---

[7] Father states that "Mother never once contacted law enforcement to report [his] alleged illicit activities." Appellant's Br. at 19. Law enforcement involvement is not a prerequisite for either requesting or issuing a protective order. In a footnote, Father also asserts that "the protective order is duplicative and unnecessary as the Paternity Order includes very specific guidelines for communication between the parties and parenting time exchanges." *Id.* at n.5. The requirements of the orders may be similar, but the potential consequences for violating them are very different: criminal prosecution for stalking or invasion of privacy for the former, and civil contempt proceedings for the latter. Father cites no authority for the proposition that the trial court may not take a belt-and-suspenders approach in this situation.